Thomas E. Shuck SBN 116228
PARKER, MILLIKEN, CLARK,
O'HARA & SAMUELIAN
A Professional Corporation
515 S. Figueroa St., 8th Floor
Los Angeles, California 90071
Telephone:    (213) 683-6500
Facsimile:    (213) 683-6669
Email: tshuck@pmcos.com

Thomas Coughlin (P40561)
Kimberly Ross Clayson (P69804)
Anthony Cimini (P86223)
TAFT STETTINIUS & HOLLISTER LLP
27777 Franklin Road, Suite 2500
Southfield, MI 48034
Telephone: (248) 351-3000
tcoughlin@taftlaw.com
kclayson@taftlaw.com
acimini@taftlaw.com
(Pro Hac Vice Admissions Pending)

Attorneys for Creditor
PATHWORD, NATIONAL ASSOCIATION

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### LOS ANGELES DIVISION

| | |
|---|---|
| In re: | Case No. 2:25-bk-21646-WB |
| C.D.S. Moving Equipment, Inc., | Chapter 11 |
| Debtor, | **OBJECTION TO DEBTOR'S EMERGENCY MOTION FOR INTERIM AUTHORITY CASH COLLATERAL** |
| | Date:    TBA |
| | Time:    TBA |
| | Place:    Courtroom:  1375 |
| | U.S. Bankruptcy Court |
| | 255 East Temple Street |
| | Los Angeles, CA 90012 |
| | Honorable Julia W. Brand |

PARKER MILLIKEN
CLARK O'HARA, A
SAMUELIAN, A
PROFESSIONAL
CORPORATION

Pathward National Association, a national banking corporation ("Pathward"),
through its attorneys, Taft Stettinius & Hollister LLP and Parker, Milliken, Clark, O'Hara
& Samuelian, a Prof. Corp., states as follows for its *Objection to Debtor's Emergency
Motion for Interim Authority Cash Collateral* ("Objection"):

## I.    BACKGROUND

### The Debtor and the Secured Creditor Relationship of Pathward

1.    On December 29, 2025 (the "Petition Date"), C.D.S. Moving Equipment,
Inc. (the "Debtor") filed a voluntary petition for bankruptcy relief under Chapter 11 of
Title 11, United States Code Sec. 101 *et seq* (the "Bankruptcy Code") commencing the
above-captioned bankruptcy proceeding (the "Bankruptcy Proceeding").

2.    Pathward is a secured creditor of the Debtor pursuant to its Credit and
Security Agreement dated May 7, 2025 (the "Credit Agreement"),[1] a Revolving Loan
Schedule dated May 7, 2025 (the "Revolving Loan Schedule"), and a Revolving Note in
the principal amount of $7,000,000.00 dated May 7, 2025 (the "Revolving Note")
(collectively, the "Loan Documents"), all in favor of Pathward.  Please see **Exhibit 1**, the
Credit Agreement, Revolving Loan Schedule and Revolving Note.

---

[1] Article 4.1 of the Credit Agreement granted Pathward a security interest in "[A]ll of the personal property in which any Borrower has any interest, whether now existing or hereafter acquired, wherever located, including all: (a) Accounts, (b) Inventory, (c) Equipment, (d) furniture and Fixtures, (e) General Intangibles, Payment Intangibles, and Intellectual Property, (f) Investment Property, (g) Deposit Accounts and monies credited by or due from any financial institution or other depository, (h) Chattel Paper, Instruments, and Documents, (i) Goods, (j) Commercial Tort Claims, (k) Letter-of-Credit Rights, (l) Contract Rights, (m) Books and records, computer software, computer programs, and supporting obligations relating to any of the foregoing, and (n) Proceeds of any of the foregoing in whatever form (collectively the "Collateral")."

3.    As of the Petition Date, the total amount due and owing by the Debtor to Pathward under the Loan Documents was approximately $2,368,790.85.

4.    Prior to the Petition Date, the Debtor was in default under the Loan Documents and on December 23, 2025, Pathward filed suit against the Debtor seeking injunctive relief, appointment of a receiver, breach of contract damages and damages due to the Debtor's fraud.[2]  Please see **Exhibit 2**, Complaint.

5.    Notwithstanding that Pathward is a creditor of the Debtor and known to the Debtor to be a secured creditor, the Debtor failed to include Pathward in its Bankruptcy Court noticing matrix. As is evidenced by the Debtor's *Label Matrix*, Pathward is not listed as a party to receive notices.  Please see **Exhibit 3**, Label Matrix.

**The Debtor's Prepetition Defaults on the Loan Documents and Improper Transfer of Assets to Related Party**

6.    Among the Debtor's pre-petition defaults resulting in the Lawsuit, the Debtor was required to, but failed to comply with its obligations under the Loan Documents to direct all of its account debtors to send payments to a lockbox account. Moreover, for such funds subject to Pathward's security interest that were not sent to the lockbox,  the Debtor failed to hold those funds "in trust" for Pathward by failing to promptly remit those payments to the lockbox account as required under the Loan Documents.[3]

---

[2] The lawsuit was filed in the United States District Court for the Eastern District of Michigan, Southern Division, Case Number 25-14143, captioned *Pathward National Association v. C.D.S. Moving Equipment, Inc.* (the "Lawsuit").
[3] See Article 4.6(a) of the Credit Agreement which says that the Debtor must direct its account debtors and other debtors "to remit all payments due" to the Debtor to a Lockbox Account, and, under Article 4.6(b) of the Credit Agreement, if the Debtor "receives any funds from a Debtor," or other specified funds, the Debtor "shall hold such funds in trust for [Pathward], shall not mix such funds received with any other funds, and shall immediately deposit such funds in the Lockbox Account in the form received," with Pathward having "sole ownership, possession and control over the

OBJECTION TO DEBTOR'S EMERGENCY MOTION FOR INTERIM AUTHORITY CASH COLLATERAL
4914-4472-9222.1

7.    Instead, the Debtor improperly and intentionally collected funds from its account debtors and diverted the Debtor's cash without accounting to Pathward for the collection of funds.

8.    Additionally, the Debtor, through its principal, Dennis Barwick, formed a related entity called Ultrapak and transferred the Debtor's inventory to Ultrapak while reporting a receivable from Ultrapak to Pathward, even though, on information and belief, Ultrapak did not pay the Debtor in good funds and the transaction was not an arm's-length sale, thereby inflating the Debtor's reported receivables and borrowing base and misrepresenting the nature and value of Pathward's Collateral.

9.    Moreover, the Debtor failed to maintain the borrowing base formula required under the Loan Documents. The Debtor is out of formula by not less than $600,000.00.

**The Debtor's Post-Petition Conduct and Deficient Cash Collateral Motion**

10.    The Debtor commenced the Bankruptcy Proceeding without representation of legal counsel.

11.    On the Petition Date, the Bankruptcy Court entered its *Order to Show Cause re Dismissal* [Doc 7] (the "Show-Cause Order") setting a hearing for December 30, 2025 (the "Show-Cause Hearing") as to why the Bankruptcy Proceeding should not be dismissed due to the Debtor's lack of legal counsel representation. As of the filing of this Objection, upon information and belief, the Bankruptcy Court gave the Debtor until January 8, 2026 to obtain counsel.

---

Lockbox Account and all deposits in the Lockbox Account," and the Debtor having no right to that account or its deposits.

- 4 -

PARKER MILLIKEN
CLARK O'HARA &
SAMUELIAN, A
PROFESSIONAL
CORPORATION

12.     Also on the Petition Date, the Debtor filed its *Emergency Motion for Interim Authority Cash Collateral* [sic] (the "<u>Cash Collateral Motion</u>") that is the subject of this Objection.

13.     The Debtor and failed to file any exhibits or evidence in support of the Cash Collateral Motion.

14.     In particular, the Cash Collateral Motion lacked any information pertaining to the Debtor's financial affairs. For instance, the Debtor did not provide information regarding its current assets and corresponding value, the Debtor did not include proposed budget projections, and the Debtor did not file an affidavit in support of the use of cash collateral.

15.     Additionally, the Cash Collateral Motion failed to identify its secured creditors, including Pathward, and no information was provided regarding the amount the Debtor owes to Pathward or any other secured creditors of the Debtor.

16.     Finally, in the last 24 hours, the Debtor, without notice to Pathward, terminated Pathward's read-only access to the Debtor's bank accounts, preventing Pathward from viewing and monitoring Debtor's bank account transactions.

## II.     LEGAL AUTHORITY

17.     Section 363(c)(2) of the Bankruptcy Code "prohibits the use of cash collateral without consent of the secured creditor or a court order." *In re Moulton Excavating*, 143 B.R. 955, 956 (Bankr. D. Utah 1992). Those prohibitions are "both absolute and automatic." *In re Trujillo*, 485 B.R. 238, 250 (Bankr. D. Colo. 2012).

18.     The Bankruptcy Code is clear that.

PARKER MILLIKEN
CLARK O'HARA &
SAMUELIAN, A
PROFESSIONAL
CORPORATION

OBJECTION TO DEBTOR'S EMERGENCY MOTION FOR INTERIM AUTHORITY CASH COLLATERAL
4914-4472-9222.1

[W]henever the bankruptcy trustee proposes to use, sell, or lease property of the bankruptcy estate in which the creditor has an interest, the court shall, at the request of the creditor, "prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of [the creditor's] interest.

*In re Martin*, 761 F.2d 472, 475-76 (8th Cir. 1985) (quoting 11 U.S.C. § 363(e)), *accord In re O'Connor*, 808 F.2d 1393, 1396-97 (10th Cir. 1987). "The whole purpose in providing adequate protection for a creditor is to insure that the creditor receives the value for which the creditor bargained prebankruptcy." *In re O'Connor*, 808 F.2d at 1396.

19.     "Adequate protection is, essentially, protection for the creditor to assure its collateral is not depreciating or diminishing in value and is made on a case-by-case basis." *In re Gunnison Center Apartments, LP*, 320 B.R. 391, 396 (Bankr. D. Colo. 2005) (citing *In re O'Connor*, 808 F.2d at 1396).

20.     Section 361 of the Bankruptcy Code sets forth three non-exclusive examples of what may constitute adequate protection: (i) cash payments equivalent to the decrease in value of the security interest; (ii) an additional or replacement lien on other property of the debtor; and/or (iii) other relief that provides the "indubitable equivalent" in value of the security interest. 11 U.S.C. § 361; *see In re Coventry Commons Assoc.*, 149 B.R. 109 (Bankr. E.D. Mich. 1992).

21.     Overall, protection is deemed "adequate" if the secured creditor's interests are preserved at "status quo" or are protected from dissipation by cash payments, replacement liens and the like. *In re Triplett*, 87 B.R. 25 (Bankr. W.D. Tex. 1987). Any adequate protection must not be illusory and, particularly in the context of the use of cash collateral, must be "of the most indubitable equivalence." *In re Goode*, 235 B.R. 584, 589

PARKER MILLIKEN
CLARK O'HARA &
SAMUELIAN, A
PROFESSIONAL
CORPORATION

OBJECTION TO DEBTOR'S EMERGENCY MOTION FOR INTERIM AUTHORITY CASH COLLATERAL
4914-4472-9222.1

(Bankr. E.D. Tex. 1999), *citing In re Waste Conversion Technologies, Inc.,* 205 B.R. 1004, 1007 (D. Conn 1991).

## III.    OBJECTION

22.    Pathward does not consent to the Debtor's use of cash collateral, and the Cash Collateral Motion should be denied.

23.    The Debtor has failed to present to the Bankruptcy Court even the most basic information necessary to support its request to use cash collateral.

24.    The Debtor is out of formula on its borrowing base as required under the Loan Documents by not less than $600,000.00.

25.    The Debtor has improperly and without justification locked Pathward out of its accounts preventing Pathward from monitoring Debtor's financial transactions which is particularly suspect since the Debtor does not have Pathward's consent or Bankruptcy Court authority to use cash collateral.

26.    Additionally, the Debtor's prepetition conduct, *inter alia* the improper transfer of inventory to a related party without consideration, failure to adequately account to Pathward regarding its cash receipts and the diversion of cash receipts from Pathward's account lockbox, is indicative of the Debtor's gross mismanagement and inability to properly and honestly manage and account for Pathward's cash collateral.

27.    It is evident by the foregoing that Pathward's interests are not adequately protected, and the Debtor cannot provide Pathward with any acceptable form of adequate protection.

/ / /

PARKER MILLIKEN
CLARK O'HARA &
SAMUELIAN, A
PROFESSIONAL
CORPORATION

OBJECTION TO DEBTOR'S EMERGENCY MOTION FOR INTERIM AUTHORITY CASH COLLATERAL
4914-4472-9222.1

1    WHEREFORE, Pathward respectfully requests that this Court DENY the Cash

2    Collateral Motion, dismiss this Bankruptcy Proceeding and award all such other relief this

3    Court deems just and appropriate.

4

5    Respectfully Submitted,

6                                                    PARKER, MILLIKEN, CLARK, O'HARA &

7                                                    SAMUELIAN, APC

8

9    Dated:  January 6 , 2026

10                                                   _____

11                                                   Thomas E. Shuck, Attorneys for
                                                     PATHWARD, NATIONAL

                                                     ASSOCIATION

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PARKER MILLIKEN
CLARK O'HARA &
SAMUELIAN, A
PROFESSIONAL
CORPORATION

OBJECTION TO DEBTOR'S EMERGENCY MOTION FOR INTERIM AUTHORITY CASH COLLATERAL
4914-4472-9222.1

# EXHIBIT 1

Docusign Envelope ID: 1FC4C6F7-BCCC-44E5-80B0-715947205D8C

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

## CREDIT AND SECURITY AGREEMENT

**PATHWARD, NATIONAL ASSOCIATION** (together with its successors and assigns, "Lender"); C.D.S. Moving Equipment, Inc., a California corporation; and together with each other person that joins this Agreement as a Borrower (each a "Borrower" and collectively the "Borrowers"); and each person or other entity that joins this Agreement as a guarantor are individually and collectively the "Guarantor", enter into this Credit and Security Agreement (as the same may be amended, restated, supplemented or otherwise modified, the "Agreement") on ___May 7___, 2025 (the "Closing Date"). For good and valuable consideration, the receipt and sufficiency of which are acknowledged, Borrowers and Lender agree as follows:

### ARTICLE 1
### DEFINITIONS

1.1    **Accounting Terms.** Except as otherwise provided in this Agreement, all accounting and financial terms used in the Loan Documents are interpreted, all accounting determinations must be made, and all financial statements delivered in connection with the Loan Documents must be prepared in accordance with GAAP as in effect from time to time. If at any time any change in GAAP would, in either case, affect the computation of any financial ratio or financial requirement set forth in any Loan Document, and either Borrowers or Lender so requests, Lender and Borrowers shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof.

1.2    **General Terms.** Terms not otherwise defined herein shall have the meanings given to them in Annex 1 hereto.

1.3    **General Construction.** When computing time periods from a specified date to a later specified date, "from" means "from and including" and "to" and "until" each mean "to but excluding". In the Loan Documents: (1) unless otherwise specified herein, "discretion" when not capitalized means a determination made by Lender in its sole and absolute discretion; (2) wherever appropriate in the context, terms used in the Loan Documents in the singular also include the plural and vice versa; (3) any reference to any Loan Document or any other document, agreement, instrument, report, certificate, or other similar deliverable, means that the Loan Document or other deliverable is satisfactory in form and substance to Lender in its discretion; (4) the words "include," "includes," and "including" are treated as being followed by "without limitation"; and (5) captions used in the Loan Documents are for convenience only and are not taken into account in interpreting the document.

### ARTICLE 2
### LOANS, PAYMENTS

2.1    **Revolving Loans.**

(a)    Subject to the terms and conditions in this Agreement and the Revolving Loan Schedule, Lender may make Advances to Borrower, from time to time and at its discretion, in an aggregate amount not to exceed at any one time outstanding the Maximum Borrowing Amount. The Revolving Loans are evidenced by the Revolving Note. Revolving Loans may be borrowed, repaid, and reborrowed in accordance with the Loan Documents.

(b)    Lender will endeavor to provide the requested funds by the end of the same Business Day so long as Lender receives the request for the Advance, together with the complete package of information required hereunder for such request, by 10:30

Docusign Envelope ID: 1FC4C6F7-BCCC-44E5-80B0-715947205D8C

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

a.m. Eastern Time on the day such request is made. If any principal, interest, fees, Expenses, or other obligations under the Loan Documents or any other agreement with Lender become due, Lender may at its discretion and without further consent of the Borrower, treat that as a request by Borrowers for a Revolving Loan to pay the applicable obligation.

(c)     The Revolving Loan Outstanding may not at any time exceed the Maximum Borrowing Amount (and if it does for any reason Borrowers shall immediately and without demand pay the excess to Lender).

(d)     Lender may in its discretion (i) reduce any of the percentages set forth in the Advance Formula, (ii) establish, increase, and reduce Reserves, and (iii) reduce one or more of the elements used to compute the Advance Formula.

(e)     Each Advance request made by the Borrower is a representation and warranty that, as of the date of such request, (i) each representation and warranty made by each Loan Party in any Loan Document is true, correct and complete in all material respects, and (ii) no Event of Default exists or would exist after giving effect to the requested Advances or Loans.

2.2     **Loan Repayment.**

(a)     The Loans are due and payable on the Revolving Loan Termination Date. Each time an Advance is made, the Obligations will be increased by the amount of the Advance. Two business days after checks, ACH or wire transfers or other credit instruments are deposited in the Lockbox Account, Lender will credit the Loan Account with the net amount actually received, whereupon interest and Maintenance Fees will no longer be charged on such amount. The date the Borrower will receive credit on funds for purposes of determining Availability is set forth in the Revolving Loan Schedule.

(b)     Lender does not have to credit the Loan Account for any payment item that is not satisfactory to Lender in its discretion. All credits are provisional and are subject to verification and final settlement. Lender may charge the Loan Account for any payment item that is returned unpaid or otherwise not collected.

(c)     The Loan Parties must make all payments in full under the Loan Documents to Lender (without any deduction whatsoever, including any setoff, recoupment, or counterclaim), at the payment office that Lender specifies in writing to Borrowers, not later than 11:59 a.m. Eastern time, on the respective due date.

2.3     **Statements.**  Lender will maintain a loan account with respect to the Revolving Loan in accordance with its customary procedures in Borrowers' name (the "Loan Account") in which it will record, among other things, the date and amount of each Advance and the date and amount of each payment. Lender's failure to record this information does not affect Lender's rights, create any liability, or release any Loan Party from any liability.

2.4     **Additional Payments.**  Any Expenses incurred and taxes paid by Lender may be charged to the Loan Account as a Loan and added to the Obligations (or, at Lender's option, must be paid by Borrowers to Lender immediately on demand).

172386060v2

Docusign Envelope ID: 1FC4C6F7-BCCC-44E5-80B0-715947205D8C

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

2.5    **Use of Proceeds.**  Borrowers shall use the Advances only for working capital needs. Borrowers shall (a) not directly or indirectly apply any part of the proceeds of any Loan to the purchasing or carrying margin stock (within the meaning of Regulation U issued by the Board of Governors of the Federal Reserve System), (b) not use the proceeds of the Loans, or lend, contribute or otherwise make available such proceeds to any Person in violation of any applicable law, and (c) use the proceeds solely for business purposes and not for personal, family, or household purposes.

<h3 align="center">ARTICLE 3<br>FEES</h3>

3.1    **Fees.**  Borrower shall pay Lender all the fees outlined in this Agreement including those listed on the Revolving Loan Schedule. Fees are computed on the basis of a year of 360 days for the actual number of days elapsed. If any payment is due on a day that is not a Business Day, the due date is extended to the next Business Day.

3.2    **Maximum Revolving Loan Amount.**  The term "Maximum Revolving Loan Amount" as referenced in this Agreement (including in the Revolving Loan Schedule) means $7,000,000.00.

<h3 align="center">ARTICLE 4<br>COLLATERAL</h3>

4.1    **Security Interest; Perfection; Preservation.**  To secure the prompt payment and performance of the Obligations now or in the future owed by Borrower to Lender, Borrower grants to Lender (and each of its Affiliates) a continuing Lien on, security interest in, pledge of, and assignment of all of the personal property in which any Borrower has any interest, whether now existing or hereafter acquired, wherever located, including all: (a) Accounts, (b) Inventory, (c) Equipment, (d) furniture and Fixtures, (e) General Intangibles, Payment Intangibles, and Intellectual Property, (f) Investment Property, (g) Deposit Accounts and monies credited by or due from any financial institution or other depository, (h) Chattel Paper, Instruments, and Documents, (i) Goods, (j) Commercial Tort Claims, (k) Letter-of-Credit Rights, (l) Contract Rights, (m) Books and records, computer software, computer programs, and supporting obligations relating to any of the foregoing, and (n) Proceeds of any of the foregoing in whatever form (collectively the "Collateral"); provided, however, that the Collateral shall not in any event secure payment or performance of any loan incurred by a Borrower under 15 U.S.C. 636(a)(36) (as added to the Small Business Act by Section 1102 of the CARES Act).  All capitalized terms used in this section which are not otherwise defined in this Agreement have the meanings assigned to them in the UCC.  The Collateral also includes all monies on deposit with Lender, or on deposit in the Lockbox Account.

Borrower must immediately take all actions that Lender requests to (x) maintain the validity, perfection, enforceability, and priority of Lender's Lien on the Collateral, (y) preserve and protect the Collateral or (z) to enable Lender to protect, exercise, or enforce its rights under the Loan Documents and the Collateral, including, but not limited to, the execution (if required) and delivery of security agreements, Waivers, control agreements, contracts and any other documents required hereunder. Borrower authorizes Lender to file against it, at Borrower's expense, financing, continuation and/or amendments statements and all other appropriate documentation for Lender to perfect and maintain its security interest in the Collateral.

4.2    **Protective Advances.**  When a Default or Event of Default exists, Lender may from time to time in its discretion (and without Loan Party's consent) make Revolving Loans for Borrower's account that Lender in its discretion believes are necessary or desirable: (1) to preserve or protect any Collateral; or (2) to enhance the likelihood of the repayment of the Obligations.

3

Docusign Envelope ID: 1FC4C6F7-BCCC-44E5-80B0-715947205D8C

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

4.3    **Risk of Loss.**  At all times with respect to all Collateral, Borrower shall bear the full risk of any loss.

4.4    **Defending Lender's Interests.**  Until (a) the Obligations are irrevocably paid in full and (b) the Loan Documents are terminated by Lender in writing, Lender's interests in the Collateral shall continue in full force and effect. When an Event of Default exists, in addition to all other rights and remedies in this Agreement or by applicable law: (1) Lender may take possession of all or any part of the Collateral; (2) each Borrower must, and Lender may, at its option, instruct all suppliers, carriers, forwarders, or others receiving or holding cash, checks, Inventory, documents, or instruments in which Lender holds a Lien to deliver them to Lender and subject them to Lender's order; (3) each Loan Party grants to Lender an irrevocable, assignable, non-exclusive license (exercisable without royalty payments or other compensation) to use, assign, license, or sublicense any present or future Intellectual Property (including in the license or sublicense access to all media in which any of the licensed items may be recorded or stored and to all related computer programs); (4) each Loan Party grants to Lender an irrevocable, assignable, non-exclusive license and lease or sublease to use, assign, license, or sublicense any leased or owned Real Property (exercisable without paying any royalty, rent, or other compensation); (5) each Loan Party Borrower authorizes Lender to pay, purchase, contest, or compromise any Lien that in Lender's discretion appears to conflict with or impair Lender's Liens; and (6) Lender may at any time take any other steps that Lender in its discretion believes are necessary or desirable to protect and preserve the Collateral. All of Lender's Expenses incurred in accordance with the preceding sentence will be charged to the Loan Account and added to the Obligations.

4.5    **Financial Disclosure.**  Each Borrower irrevocably authorizes and directs its accountants and auditors to promptly upon Lender's request, to deliver to Lender copies of each Borrower's financial statements, trial balances, and all other accounting records in the accountant's or auditor's possession, and to disclose to Lender any information they may have concerning each Borrower.

4.6    **Accounts.**

   (a)    Remittances. Borrower must immediately notify all of its Account Debtors and any other person or party that is liable to it (collectively a "Debtor") to remit all payments due Borrower to the Lockbox Account. The remit to address on all documents related to the accounts must be the Lockbox Account.  At Lender's request, all such documents, including invoices, purchase orders, or contracts must be marked by Borrowers to show assignment to Lender, and each Borrower must notify each of its Account Debtors by mail, in a form approved by Lender, that the Account has been assigned to Lender and that all payments on the Account must be made payable to such Borrower or Lender, at Lender's discretion, to the Lockbox Account or such other address provided by Lender in writing. Lender may at any time and from time to time, and at its discretion, notify any Debtor or third-party payee to make payments payable directly to Lender or to notify Debtor of the assignment to Lender.  All of Lender's expenses for notifications will be paid by Borrowers.

   (b)    If a Borrower receives any funds from a Debtor, or if a Borrower receives any proceeds of insurance, tax refunds or any and all other funds of any kind, such Borrower shall hold such funds in trust for Lender, shall not mix such funds received with any other funds, and shall immediately deposit such funds in the Lockbox Account in the form received.  Lender will have sole ownership, possession and control over the Lockbox Account and all deposits in the Lockbox Account.  No Borrower has any right to the Lockbox Account or any deposits in

4

172386060v2

Docusign Envelope ID: 1FC4C6F7-BCCC-44E5-80B0-715947205D8C

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

the Lockbox Account. Lender has no duty as to collection or protection of funds in the Lockbox Account as long as it is not grossly negligent or commits actual fraud. All expenses plus any applicable administration and servicing fees of the Lockbox Account will be paid by Borrowers.

(c)    Adjustments. Without Lender's prior written consent, no Borrower may (1) compromise or adjust any Account (or extend the time for its payment) or (2) accept any returns of merchandise or grant any discounts, allowances, or credits, except in the ordinary course of such Borrower's business consistent with such Borrower's past practices and that have been disclosed to Lender in writing.

(d)    No Liability. Lender does not have any liability for any error or omission or delay of any kind occurring in the settlement, collection, or payment of any of the Collateral or any instrument received in payment of Collateral, or for any damage resulting therefrom. Lender may accept the return of the goods represented by any of the Accounts (without notice to or consent by any Borrower), all without discharging or in any way affecting any Borrower's liability.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES

Each Borrower represents and warrants that:

5.1    **Authority.** It has the full power, authority, and legal right to enter into the Loan Documents and to perform its obligations under the Loan Documents. Each Borrower's execution, delivery, and performance of the Loan Documents has been approved by all necessary legal and organizational Persons. The individual(s) executing the Loan Documents on behalf of Borrower has or have been properly and duly authorized. All obligations under each Loan Document it executes are legal, valid, and binding obligations enforceable against it in accordance with their terms.

5.2    **Formation; Qualification; Subsidiaries.** Each Borrower (a) is duly organized and existing in good standing in the state of its jurisdiction; (b) is duly qualified and authorized to conduct business in any state in which the nature and extent of its business requires qualification and (c) has no Subsidiaries or other Affiliates except for as identified in the Revolving Loan Schedule. Borrower's organizational identification number, state of organization, and states where it is qualified to do business are as identified in the Revolving Loan Schedule.

5.3    **Collateral.** Borrower is the owner of all of the Collateral, is listed as the owner of all titled Collateral, and there are no other liens or claims against the Collateral, except for the Permitted Liens. All of the Collateral is personal property and none of the Collateral will be permanently affixed to real estate.

5.4    **No Governmental Approval; No Conflict.** The transactions contemplated by this Agreement and the other Loan Documents do not (a) require any consent or approval of, registration or filing with, or any other action by, any Governmental Body (except for those that have been obtained); (b) violate any law, government rule, regulation, order, judgment or award applicable to any Loan Party or the Collateral; (c) violate or create a default under any indenture, agreement, or other instrument binding on any Loan Party or any of their respective assets; (d) violate any provision of any Loan Party's organizational documents; or (e) create any Lien on any asset of any Loan Party (except Liens created under the Loan Documents).

172386060v2

Docusign Envelope ID: 1FC4C6F7-BCCC-44E5-80B0-715947205D8C

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

5.5    **Tax Returns.** Each Loan Party (a) has timely filed and will timely file all federal, state, and local tax returns, and all other reports required by law to be filed, and (b) has timely paid all taxes, assessments, fees, and other governmental charges. No tax liens have been filed against any asset of any Loan Party and no claims are being asserted for any taxes.

5.6    **Financial Information.**

(a)    The financial information furnished by the Loan Parties to Lender has been prepared in accordance with GAAP, consistently applied, all financial statements present fairly in all material respects the Loan Parties' financial condition at such date and the results of their operations for the applicable period, and any projections of the business operations of each Loan Party that have been give or will be given to Lender will be based upon such Loan Party's reasonable assumptions and estimates.

(b)    Since February 28, 2025, there has been no event, development or other change in circumstances that has had or could reasonably expected to have a Material Adverse Effect in the business, operations, condition, property or prospects (financial or otherwise) of the Loan Parties, taken as a whole.

5.7    **Name; Tradenames.** During the last five years no Loan Party (a) has been known by any other name or has sold Inventory under any other name; (b) has been the surviving entity of a merger or consolidation or has acquired a material portion of the assets of any Person; or (c) has used any fictitious name, d/b/a, tradename or tradestyle (collectively, the "Tradenames"), except as set forth in the Revolving Loan Schedule.

5.8    **Borrower Locations.** The Revolving Loan Schedule sets forth (a) where Borrower's chief executive office is located; (b) of all places of business of Borrowers; (c) where any Equipment and Inventory of Borrowers are located; and (d) where Borrower keeps the other Collateral and its books and records related thereto.

5.9    **Licenses and Permits.** Each Loan Party has complied with and has all applicable licenses or permits to conduct its business required by applicable federal, state, and local laws.

5.10    **Solvency; No Litigation; No Violation.**

(a)    After giving effect to the transactions contemplated by the Loan Documents and the Subordinated Debt, each Borrower is and will continue to be solvent, able to pay its debts as they mature, and have sufficient capital to carry on its business and all businesses in which it is about to engage.

(b)    Except as set forth in the Revolving Loan Schedule, (1) no Borrower or other Loan Party has any pending or threatened litigation, investigation, arbitration, actions, or proceedings (including commercial tort claims in which Borrower is the plaintiff or moving party) against such Borrower or other Loan Party; and (2) no Borrower or any other Loan Party has violated any statute, regulation or ordinance, or any order of any court, Governmental Body, in each case that could reasonably be expected to have a Material Adverse Effect.

6

Docusign Envelope ID: 1FC4C6F7-BCCC-44E5-80B0-715947205D8C

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

5.11    **No Default.** No Loan Party is in default under any Indebtedness or under a contract that could reasonably be expected to have a Material Adverse Effect.

5.12    **No Labor Disputes.** No Borrower is involved in or aware of any labor dispute.

5.13    **Disclosure.** No representation or warranty made by any Loan Party in any Loan Document or in any financial statement, report, certificate, or other document furnished to Lender by any Loan Party is untrue or misleading in any respect (through omission or otherwise). Each Loan Party has disclosed to Lender in writing each fact and circumstance that could reasonably be expected to have a Material Adverse Effect.

5.14    **Anti-Terrorism.**

(a)    No Loan Party or any of its Affiliates or any of their respective agents is any of the following (each a "Blocked person"): (1) a person that is listed in the annex to, or is subject to, Executive Order No. 13224; (2) a person that is owned or controlled by, or acting for or on behalf of, any person, that is listed in the annex to, or is subject to, Executive Order No. 13224; (3) a person with whom Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law; (4) a person that commits, threatens, or conspires to commit or supports "terrorism" as defined in Executive Order No. 13224; (5) a person that is named as a "specially designated national" on the most current list published by the U.S. Treasury Department Office of Foreign Asset Control; or (6) a person who is affiliated or associated with any of the foregoing persons.

(b)    No Loan Party or any of its agents acting or benefiting in any capacity in connection with the transactions under the Loan Documents (1) conducts any business or engages in making or receiving any funds, goods, or services to or for the benefit of any Blocked person or (2) deals in (or otherwise engages in) any transaction relating to any property or interests in property blocked under Executive Order No. 13224.

(c)    Neither the extension of the Loans made pursuant to this Agreement nor the use of the proceeds thereof will violate any Anti-Terrorism Law.

5.15    **Delivery of Subordinated Debt Documents.** Lender has received complete copies of the Subordinated Debt Documents and related documents (including all exhibits, schedules and disclosure letters referred to therein or delivered pursuant thereto, if any) and all amendments thereto, waivers relating thereto and other side letters or agreements affecting the terms thereof. None of such documents and agreements has been amended or supplemented, nor have any of the provisions thereof been waived, except pursuant to a written agreement or instrument which has been delivered to Lender.

5.16    **ERISA Matters.** Except as disclosed to the Lender in writing prior to the date hereof, neither any Borrower nor any ERISA Affiliate (a) maintains or has maintained any Pension Plan, (b) contributes or has contributed to any Multiemployer Plan or (c) provides or has provided post-retirement medical or insurance benefits with respect to employees or former employees (other than benefits required under Section 601 of ERISA, Section 4980B of the Code or applicable state Law).

Refer to the Revolving Loan Schedule for any additional Representations and Warranties.

172386060v2

Docusign Envelope ID: 1FC4C6F7-BCCC-44E5-80B0-715947205D8C

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

## ARTICLE 6
## AFFIRMATIVE COVENANTS

Until all Obligations are irrevocably paid and performed in full and the Loan Documents are terminated, each Borrower shall:

6.1 **Conducting Business; Maintaining Existence; and Assets.** Continuously conduct and operate its business according to good business practice, keep its existence in full force and effect, file all reports and pay all franchise and other taxes and license fees, and do all other acts and things that are necessary or desirable to maintain its rights, licenses, leases, powers, and franchises.

6.2 **Compliance with Laws.** Comply with all applicable laws, acts, rules, orders, regulations, or ordinances of any Governmental Body, except to the extent that failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.

6.3 **Financial Covenants.** Waived.

6.4 **Indebtedness; Payment of Obligations.** Pay, when due, all Indebtedness and its other obligations of whatever nature, including without limitation all taxes, assessments, and other governmental charges, claims for labor, supplies, rent, or other obligations (except where the amount or validity thereof is being disputed in good faith and reserves in conformity with GAAP with respect thereto have been provided on the books of the Borrowers) and not otherwise default under any Indebtedness or its other obligations.

6.5 **Deposit Accounts.** Except for the accounts listed on the Revolving Loan Schedule, maintain all deposit, investment, brokerage, and other financial accounts with Lender. Each account on the Revolving Loan Schedule, upon the request of Lender, must at all times be subject to an account control agreement satisfactory to Lender.

6.6 **Insurance.** Maintain, at its own cost and expense, (a) insurance against all risks of physical loss of or damage to all properties and assets in which any Borrower has an interest in such amounts as Lender may require in its Discretion and maintain business interruption insurance as is customary for companies engaged in businesses similar to each Borrower, and (b) commercial general liability insurance (including blanket contractual liability coverage and products liability coverage) for personal and bodily injury and property damage in such amounts as Lender may require in its Discretion. All such insurance shall be in form (including all endorsements required by Lender), in amounts and with carriers satisfactory to Lender. All insurance policies shall name Lender, and its successors and assigns, as "Lender Loss Payee" (under all property insurance policies) and as "Additional Insured" (under all liability insurance policies) and shall require that the insurer provide at least thirty (30) days prior written notice to Lender before a cancellation of or a material change to an insurance policy. Each Borrower must furnish Lender with evidence of insurance satisfactory in form and substance to Lender. If any Borrower does not obtain, maintain, or renew any insurance required by the Loan Documents, Lender may obtain and pay for it.

6.7 **Beneficial Ownership Certificate.** Provide to Lender: (a) a new Beneficial Ownership Certificate when the individual(s) identified as a Beneficial Owner have changed; and (b) any other information and documentation that Lender may request from time to time related to Lender's compliance with applicable laws (including the USA PATRIOT Act and other "know your customer" and anti-money laundering rules and regulations).

6.8 **Collateral Maintenance and Warranties.** Maintain the Collateral in good operating condition and repair (reasonable wear and tear excepted), in accordance with industry standards, and must

8

172386060v2

Docusign Envelope ID: 1FC4C6F7-BCCC-44E5-80B0-715947205D8C

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

make all necessary replacements and repairs so that its value and operating efficiency are maintained and preserved.

6.9    **Environmental Matters.**  Ensure that no Hazardous Substances are on any Real Property (except as permitted by applicable law or appropriate Governmental Bodies), notify Lender all claims, complaints, notices or inquiries relating to compliance with Environmental Laws, which, if adversely determined, could reasonably be expected to have a Material Adverse Effect, cure and have dismissed with prejudice any material actions and proceedings relating to its compliance with Environmental Laws.

6.10    **Notices.**  Notify Lender in writing:

(a)    Immediately if any of the following occur: (i) any Default or Event of Default; (ii) any event or circumstance that could reasonably be expected to cause any financial statement, projection, Borrowing Base Certificate (if applicable) or other information or report furnished to Lender to be untrue or misleading; (iii) a transfer of the ownership of any Equity Interest in any Borrower; (iv) any Borrower knows or has reason to believe that any Account Debtor disputes any Account, whether or not such dispute is deemed valid by any Borrower; (v) any litigation, suit, administrative proceeding, or other proceeding affecting any Loan Party or the Collateral (whether or not the claim is covered by insurance) in which the amount of damages claimed exceeds $20,000.00 (individually or in the aggregate); (vi) any matter materially affecting the Collateral or if any Account Debtor asserts any claims or setoffs against Accounts.; (vii) any Loan Party or any Collateral violates or is alleged to have violated any Governmental Body's laws, statutes, regulations, or ordinances, (viii) any representation or warranty made hereunder would be materially untrue or misleading if remade; and (ix) any other development that has or could reasonably be expected to have a Material Adverse Effect.

(b)    At least 30 days prior to any Loan Party opening any new place of business, closing any existing place of business, or changing its legal name, entity type, or jurisdiction of organization, incorporation, or formation.

6.11    **Field Examinations.**  Borrowers shall permit Lender to at any time examine, audit, check, inspect, and make abstracts and copies of Borrower's books, records, assets and liabilities audits, correspondence, and all other materials related to the Collateral.  Lender has no obligation to provide any Loan Party with the results of the examination or copies of any reports.  Borrowers shall reimburse Lender for the costs to perform two (2) field examinations per year that will be performed by Lender's inspector, whether an officer of Lender or an independent party with all expenses, including all out of pocket expenses, including, but not limited to, transportation, hotel, parking, and meals paid by Borrowers.  If a Default or Event of Default exists, the number of field examinations to be reimbursed by Borrowers may be increased in Lender's discretion.

6.12    **Financial Statements.**

(a)    Furnish Lender within 120 days after the end of each of the Borrowers' fiscal years, the Borrowers' unaudited financial statements on a consolidated and consolidating basis (including statements of income, stockholders' equity, and cash flow from the beginning of the current fiscal year to the end of the current fiscal year) and the balance sheet as at the end of the fiscal year, certified by a Responsible Representative of Borrower, and

9

Docusign Envelope ID: 1FC4C6F7-BCCC-44E5-80B0-715947205D8C

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

(b)    Furnish Lender within 30 days after the end of each month, the Borrowers' unaudited balance sheet on a consolidated and consolidating basis and the Borrowers' unaudited statements of income, stockholders' equity, and cash flow on a consolidated and consolidating basis, certified by a Responsible Representative of Borrower, reflecting the results of operations from the beginning of the month to the end of the month (and for the month), setting forth in each case in comparative form the figures from the projected annual operating budget delivered under Section 6.13(a) for the current fiscal year.

6.13   **Certificates; Reports; Other Financial Information.** Furnish to Lender, in form and substance satisfactory to Lender in its discretion:

(a)    No later than 30 days prior to the end of each fiscal year of the Borrowers (beginning with the first fiscal year after the Closing Date) the Borrowers' month-by-month projected operating budget and cash flows on a consolidated and consolidating basis for the following fiscal year (including for each month an income statement, a cash flow statement, and a balance sheet and Availability projection);

(b)    (i) no later than 15 days after the end of each month, a detailed accounts receivable aging report including all invoices aged by invoice date (reconciled to the general ledger and the Borrowing Base Certificate, if applicable), (ii) no later than 15 days after the end of each month, a summary accounts payable aging report including all accounts payable aged by invoice date (reconciled to the general ledger), and (iii) with each Borrowing Base Certificate but not less than weekly Inventory certification reports listing Inventory by category and location as of the end of the prior week;

(c)    Prior to any request for an Advance, upon request by Lender, and at such intervals as Lender may require in its Discretion: (i) assignment schedules; (ii) copies of Account Debtor invoices; (iii) evidence of shipment and delivery of Goods; and (iv) such further schedules, documents, certificates, reports and information as Lender may require(including, without limitation, trial balances, test verifications, credit memos, sales and cash receipt journals, purchase orders, evidence of delivery, proof of shipment, and timesheets), in each case satisfactory to Lender in its Discretion and certified as true and correct in all material respects by a Responsible Representative of Borrowers. Lender may contact any Persons who hold or are obligated on any part of the Collateral, such as Account Debtors, to notify them of Lender's Lien and to confirm and verify Accounts by any manner and through any medium it chooses;

(d)    Reserved;

(e)    If requested, current annual tax returns of each Loan Party prior to April 15 of each calendar year or, if an extension is filed, at the earlier of (a) filing, or (b) the extension deadline;

(f)    If requested, weekly payroll summaries and evidence of tax payments of Borrowers together with copies of bank statements from which the funds are impounded;

172386060v2

Docusign Envelope ID: 1FC4C6F7-BCCC-44E5-80B0-715947205D8C

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

(g)    If requested, detailed customer lists of each Borrower showing the customer's name, address, e-mail address, phone number and any other information Lender reasonably requests; and

(h)    promptly upon request, such other financial information as Lender may from time to time request in its Discretion.

Refer to the Revolving Loan Schedule for any additional required certificates, reports, and information.

6.14    **Supplemental Instruments; Further Assurances.** From time to time at Borrower's expense, execute and deliver, or cause to be executed and delivered, to Lender all other documents and take or cause to be taken such further actions are required by law or that that Lender may request in its Discretion to carry out the terms and conditions of the Loan Documents and to ensure the perfection and priority of Lender's Liens (including cooperating with Lender in obtaining control of any Collateral in the possession of third Persons).

Refer to the Revolving Loan Schedule for any additional Affirmative Covenants.

## ARTICLE 7
## NEGATIVE COVENANTS

Until all Obligations are irrevocably paid and performed in full and the Loan Documents are terminated, no Borrower may:

7.1    **Mergers; Consolidations; Asset Sales.**

(a)    Merge, consolidate, divide, or otherwise reorganize with or into any Person or acquire all or a material portion of any Person's assets or Equity Interests.

(b)    Sell, pledge, lease, transfer, or otherwise dispose of any of its properties or assets except Inventory sold in the ordinary course of Borrowers' business.

7.2    **Liens.** Create, assign, transfer, or allow to exist any Lien on any of its property, except for Permitted Liens.

7.3    **Investments.** Purchase or acquire assets, obligations or Equity Interests of, or any other interest in, any Person, without the prior written consent of Lender.

7.4    **Loans.** Make advances, loans, or credit extensions to any Person, (including any Affiliate, Subsidiary, officer, shareholder, member, partner, director, or employee), except for commercial trade credit in connection with Inventory sales in the ordinary course of its business and consistent with practices that existed on the Closing Date and that have been disclosed to Lender in writing.

7.5    **Distributions and Management Fees.**

(a)    Declare or pay any dividend or make any other distribution with regard to its Equity Interests or redeem, purchase, or otherwise acquire directly or indirectly any of its Equity Interests, provided that if a Borrower is taxed as an S Corporation or other "pass-through" entity, such Borrower may, so long as no Default or Event of Default exists or would result therefrom, distribute profits to its equity holders in the maximum amount necessary to enable such holders to pay personal, state

11

Docusign Envelope ID: 1FC4C6F7-BCCC-44E5-80B0-715947205D8C

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

and federal taxes directly attributable to the profits earned by such Borrower for such year.

(b)    Enter into or issue, as applicable, any subscriptions, options, warrants, calls, rights, or other agreements or commitments of any kind relating to any Equity Interests of any Borrower.

(c)    Pay any management, advisory, consulting, or other similar fees to any Person.

7.6    **Indebtedness.** Create, incur, assume, or allow to exist any Indebtedness, loan or guaranty or assume any obligation or liability, whether as borrower, guarantor, surety, indemnitor or otherwise except:

(a)    Indebtedness existing on the Closing Date;

(b)    Indebtedness to Lender; unsecured Indebtedness in an aggregate principal amount not to exceed $20,000.00; and

(c)    The Subordinated Debt provided that it is at all times subject to a Subordination Agreement.

7.7    **Business.** Change in any material respect the nature of the business that it engaged in on the Closing Date.

7.8    **Affiliate Transactions.** Directly or indirectly, purchase, acquire, or lease any property from, or sell, transfer, or lease any property to, or otherwise deal with, any Affiliate, except transactions on an arm's length basis and on terms no less favorable than terms that could be obtained from a Person who is not an Affiliate.

7.9    **Subsidiaries; Partnerships.** Form any Subsidiary, or enter into any partnership, joint venture, or similar agreement with any third party without the prior written consent of Lender.

7.10    **Fiscal Year and Accounting Changes.** Change its fiscal year-end from December 31 or make any material change (1) in accounting treatment and reporting practices (except as required by GAAP) or (2) in tax reporting treatment (except as required or permitted by law).

7.11    **Amending Charter Documents.** Amend, modify, or waive any term or provision of its charter, certificate, or articles of incorporation or organization, by-laws, partnership agreement, operating agreement, and other similar organizational or governing documents.

7.12    **Anti-Terrorism Laws.** At any time: (1) Directly or through its Affiliates or agents, conduct any business or engage in any transaction or deal with any Blocked Person, including making or receiving any funds, goods, or services to or for the benefit of any Blocked Person; (2) directly or through its Affiliates or agents, deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked under Executive Order No. 13224; (3) directly or through its Affiliates or agents, engage in or conspire to engage in any transaction that evades or avoids (or whose purpose is to evade or avoid), or attempts to violate, any of the prohibitions in Executive Order No. 13224, the USA Patriot Act, or any other Anti-Terrorism Law; or (4) not deliver to Lender any certification or other evidence requested by Lender in its sole judgment confirming each Borrower's compliance with this Section.

12

Docusign Envelope ID: 1FC4C6F7-BCCC-44E5-80B0-715947205D8C

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

7.13    **Subordinated Debt; Modification of Subordinated Debt Documents.** Except as expressly allowed by the Subordination Agreements, at any time, directly or indirectly, pay, prepay, repurchase, redeem, retire or otherwise acquire, or make any payment on account of any Subordinated Debt. Amend, modify, or waive any term or provision of any Subordinated Debt Document.

7.14    **Amending Leases.** Amend, modify, or waive any term or provision of any lease of real property (except amendments, modifications, and waivers consented to in writing by Lender in its Discretion).

7.15    **ERISA.** Except as disclosed to the Lender in writing prior to the date hereof, neither any Borrower nor any ERISA Affiliate will (a) adopt, create, assume or become a party to any Pension Plan, (b) incur any obligation to contribute to any Multiemployer Plan, (c) incur any obligation to provide post-retirement medical or insurance benefits with respect to employees or former employees (other than benefits required by law) or (d) amend any Plan in a manner that would materially increase its funding obligations.

7.16    **Redirection of Funds.** Notify any Account Debtor to make payment to any account other than the Lockbox Account or request an Account Debtor to withhold or stop any payment otherwise directed by Lender.

Refer to the Revolving Loan Schedule for any additional Negative Covenants.

## ARTICLE 8
## CONDITIONS PRECEDENT AND POST-CLOSING DELIVERABLES

Refer to the Revolving Loan Schedule for any Conditions Precedent and Post-Closing Deliverables.

## ARTICLE 9
## EVENTS OF DEFAULT

Any of the following events is an "Event of Default":

9.1    **Payment.** Any Loan Party does not pay any Obligation when due (whether at maturity, by demand, by acceleration, or otherwise).

9.2    **Misrepresentation.** Any representation or warranty made or treated as having been made by any Loan Party in any Loan Document, any related agreement, or in any certificate, document, or financial or other statement furnished to Lender is misleading in any material respect on the date when made or treated as having been made.

9.3    **Covenant Breaches.** Any Borrower does not perform, keep, or observe any term, provision, condition, or covenant in any Loan Document or in any other agreement with Lender.

9.4    **Judgments.** Any judgment or judgments are rendered for an aggregate amount exceeding $20,000.00, or judgment liens are filed against any Borrower (or any of its property) that, within 15 days, are not to Lender's satisfaction satisfied, stayed, discharged of record, or bonded.

9.5    **Insolvency.** Any Borrower: (1) becomes insolvent; (2) is unable, or admits in writing its inability, to pay its debts as they become due; (3) makes a general assignment for the benefit of creditors or to a liquidation agent; (4) files on its behalf or consents to an Insolvency Proceeding; (5) has an Insolvency Proceeding filed or instituted against it that is not dismissed within 30 days after it is filed or instituted; (6) applies to a court for the appointment of a receiver, trustee, or custodian for any of its assets;

172386060v2

Docusign Envelope ID: 1FC4C6F7-BCCC-44E5-80B0-715947205D8C

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

(7) has a receiver, trustee, or custodian appointed for any of its assets (with or without its consent); or (8) commences a self-liquidation of its assets.

9.6 **Material Adverse Effect**. A Material Adverse Effect occurs.

9.7 **Lender's Lien Priority**. For any reason any Lien created under any Loan Document is not or no longer remains a valid, perfected, first-priority Lien (other than purchase-money Liens on Equipment that are expressly allowed under this Agreement).

9.8 **Default Under Indebtedness**. With respect to any Indebtedness with a balance of $50,000.00 or more (1) a default exists under that Indebtedness that allows the holder of the Indebtedness to accelerate the Indebtedness (whether or not that right has been waived or deferred), or (2) any other default exists under any agreement of any kind now or hereafter existing between any Borrower and Lender, or any of Lender's Affiliates.

9.9 **Change of Control**. Borrower effects an acquisition, change in control, sale, merger, reorganization or other event (whether in one or more transactions) that results in the holders of more than 25% of the Equity Interests of such Person immediately before such event no longer being the holders of more than 25% of the Equity Interests of such Person or its successor immediately after such event.

9.10 **Invalidity**. Any provision of any Loan Document is not, at any time and for any reason, valid and binding on each Loan Party, or any Loan Party claims in writing that any provision of any Loan Document is not, for any reason, valid and binding on any Loan Party.

9.11 **Destruction of Collateral**. Any portion of the Collateral is seized or taken by a Governmental Body, or any Loan Party (or any Loan Party's title or rights), are subject to litigation that might, as determined by Lender in its discretion, result in material impairment or loss of the security provided by any Loan Document, or a casualty occurs as to any material asset used in the conduct of any Loan Party's business.

9.12 **Guarantor Repudiation.** (1) Any Guaranty is not in full force and effect; (2) any action is taken to discontinue or to assert that any Guaranty is not in full force and effect; (3) any Guarantor does not comply with any of the terms or provisions of its Guaranty or any other default occurs under any Guaranty; or (4) any Guarantor denies or gives Lender notice that it purports to have no further liability under any Guaranty.

9.13 **Indictment; Forfeiture**. The indictment of, or institution of any legal process or proceeding against any Loan Party, or any of its or their officers or directors, where the relief, penalties, or remedies sought or available are a felony or include the forfeiture of more than $20,000.00 of property of any Loan Party or the imposition of any stay or other order, the effect of which could cause a Material Adverse Effect on the business of any Loan Party.

9.14 **Post-Closing Deliverables**. Borrowers shall fail to timely deliver to Lender any of the Post-Closing Deliverables within the respective time period set forth herein.

9.15 **Subordinated Debt Default**. An event of default occurs under any Subordinated Debt Documents or if any party to a Subordination Agreement attempts to terminate or challenge the validity of that Subordination Agreement.

The demand nature of the Obligations is not modified by reference to a Default or Event of Default in this Agreement or the other Loan Documents and any reference to a Default is for the purpose of permitting

14

Docusign Envelope ID: 1FC4C6F7-BCCC-44E5-80B0-715947205D8C

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

Lender to exercise its default remedies, including without limitation, charging interest at the Default Rate (as defined and provided in the Revolving Loan Note).

**ARTICLE 10**
**LENDER'S RIGHTS AND REMEDIES AFTER AN EVENT OF DEFAULT**

10.1    **Rights and Remedies.** When an Event of Default occurs under Section 9.5, all Obligations are immediately due and payable. Without limiting the demand nature of the Obligations (including the Prepayment Fee), when any Event of Default exists, Lender has all rights and remedies provided under the Loan Documents, by law, or in equity and under all other existing and future agreements between Lender and any Loan Party. All rights and remedies are cumulative. Without limiting the preceding, when an Event of Default exists, Lender may, at its election, without notice and without demand, do any one or more of the following (all of which are authorized by the Borrowers):

(a)    Charge the Default Rate.

(b)    Declare all Obligations immediately due and payable.

(c)    Stop making Loans or Advances.

(d)    Terminate Lender's future obligations to any Borrower (which does not affect Lender's rights, its Liens on the Collateral, or the Obligations).

(e)    Settle or adjust disputes and claims directly with Account Debtors on terms that Lender determines in its discretion.

(f)    Direct the Borrowers to hold and segregate all returned Inventory in trust for Lender.

(g)    Request Borrowers to assemble the Collateral, deliver the Collateral to any location specified by Lender, or allow Lender or its agents to pick up the Collateral.

(h)    Without retaining any Collateral in satisfaction of an obligation (within the meaning of Section 9-620 of the UCC), Lender may hold or set off and apply to the Obligations any: (1) balances and deposits of any one or more of the Borrowers held by Lender (including any amounts received in the lockbox); (2) Indebtedness at any time owing to or for the credit or the account of any Borrower held by Lender; and (3) all of each Borrower's balances and deposits of any Borrower held or controlled by Lender (including any amounts received in the lockbox).

(i)    Sell the Collateral at either a public or private sale in such manner and at such places as Lender determines is commercially reasonable. Lender, may but is not obligated to, credit bid and purchase all or any portion of the Collateral at any sale. The Borrowers' rights under all licenses and all franchise agreements may be used by Lender without cost.

(j)    Appoint a receiver for all or any part of the Collateral (whether the receivership is incidental to a proposed sale of the Collateral under the UCC or otherwise). Each Borrower consents to the appointment of a receiver without notice or bond, to the fullest extent not prohibited by applicable law, and waives all notices of and

15

172386060v2

Docusign Envelope ID: 1FC4C6F7-BCCC-44E5-80B0-715947205D8C

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

defenses to the appointment of a receiver and may not oppose any application Lender makes for the appointment of a receiver.

10.2    **No Waiver.** No delay on Lender's part in exercising any right, power, or privilege under this Agreement or any Loan Document is a waiver, nor does any single or partial exercise of any right, power, or privilege under this Agreement or otherwise preclude the exercise of any other right, power, or privilege.

## ARTICLE 11
## WAIVERS AND JUDICIAL PROCEEDINGS

11.1    **Notice Waiver.** To the fullest extent not prohibited by law, each Borrower waives all notices and demands that it would otherwise be entitled to receive (including non-payment of any of the Accounts, demand, presentment, protest, notice of acceptance, notice of Loans or Advances made, credit extended, or Collateral received or delivered).

11.2    **Delay.** Any delay or omission by Lender in exercising any right, remedy, or option does not waive that right (or any other right, remedy, option, or default).

11.3    **Jury Waiver.** EACH PARTY TO THIS AGREEMENT EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION (1) ARISING UNDER ANY LOAN DOCUMENT, OR ANY OTHER INSTRUMENT, DOCUMENT, OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION WITH ANY LOAN DOCUMENT, OR (2) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT, ANY LOAN DOCUMENT, OR ANY OTHER INSTRUMENT, DOCUMENT, OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION WITH ANY OF THE PRECEDING, OR THE TRANSACTIONS RELATED TO ANY OF THE PRECEDING.

## ARTICLE 12
## MISCELLANEOUS

12.1    **Governing Law; Jurisdiction.** This Agreement and the other Loan Documents will be interpreted and determined under the laws of the State of Michigan without any regard to any conflict of laws provisions. EACH BORROWER AGREES THAT ANY ACTION TO ENFORCE SUCH BORROWER'S OR ANY OTHER LOAN PARTY'S OBLIGATIONS TO LENDER SHALL BE PROSECUTED EITHER IN THE CIRCUIT COURT OF OAKLAND COUNTY MICHIGAN OR THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN (UNLESS LENDER ELECTS SOME OTHER JURISDICTION), AND EACH BORROWER SUBMITS TO THE JURISDICTION OF ANY SUCH COURT SELECTED BY LENDER. EACH BORROWER WAIVES ANY AND ALL RIGHTS TO CONTEST THE JURISDICTION AND VENUE OF ANY ACTION BROUGHT IN THIS MATTER AND BORROWERS AND OTHER LOAN PARTIES MAY BRING ANY ACTION AGAINST LENDER ONLY IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND OR THE FEDERAL COURT OR THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN.

12.2    **Entire Understanding and Amendments.** This Agreement and the other Loan Documents, including all exhibits, schedules, annexes and similar attachments hereto (all of which are incorporated herein by reference), are the entire agreement among the parties related to the subject matter of the Loan Documents. The Loan Documents supersede all prior agreements, commitments, and understandings among the parties related to the subject matter of the Loan Documents. No part of the Loan

16

Docusign Envelope ID: 1FC4C6F7-BCCC-44E5-80B0-715947205D8C

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

Documents may be changed, modified, amended, waived, supplemented, discharged, cancelled, or terminated other than by an agreement in writing signed by Lender and the Borrowers.

12.3    **Transfers and Assignments.** The Borrowers may not assign or otherwise transfer any of their rights or Obligations without Lender's prior written consent. Lender may at any time sell or grant a lien on all or any portion of its interest in the Loan Documents and the Obligations through sales, participations, or otherwise.

12.4    **Maximum Charges.** If interest, fees, and other charges under the Loan Documents would exceed the highest rate allowed under law, the excess amount will instead be first applied to any unpaid principal balance owed by Borrowers and then Lender will refund the remaining balance to Borrowers. In addition, the Loan Documents will be automatically amended to provide for the highest allowed rate.

12.5    **Payment Application.** Lender has the continuing and exclusive right to apply or reverse and re-apply any payment and any and all proceeds of Collateral to any portion of the Obligations in such order as Lender determines in its discretion. If any Borrower makes a payment or Lender receives any payment or proceeds of the Collateral for any Borrower's benefit that are later invalidated, declared to be fraudulent or preferential, set aside, or required to be repaid to a trustee, debtor-in-possession, receiver, custodian, or any other Person then, to that extent, the Obligations or part of the Obligations intended to be satisfied is revived and continue as if the payment or proceeds had not been received by Lender.

12.6    **Indemnity.** Each Borrower indemnifies Lender (and each of its purchasers, assigns and holders of participation interests) and each of its officers, directors, attorneys, representatives, Affiliates, employees, advisors, and agents from and against any and all claims, liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, Expenses, and disbursements of any kind or nature whatsoever (including attorneys' fees, costs and disbursements of counsel) that may be imposed on, incurred by, or asserted against Lender in any litigation, proceeding, or investigation with respect to any aspect of, or any transaction contemplated by, or referred to in, or any matter related to, the Loan Documents, whether or not Lender is a party to the Loan Documents, excluding those matters caused solely by Lender's gross negligence or willful misconduct. The Borrowers' obligation to pay the Expenses and all of the reimbursement and indemnification obligations provided for in the Loan Documents are part of the Obligations, are secured by all of the Collateral, and survive the repayment of the Obligations.

12.7    **Termination.** The termination of this Agreement does not affect any Borrower's Obligations arising before the effective termination date, and the Loan Documents remain in full force and effect until all Obligations are irrevocably paid and performed in full. The Liens and rights granted to Lender continue in full force and effect notwithstanding the termination of this Agreement or that the Loan Account may from time to time be in a zero or credit position, until all of the Obligations of each Loan Party have been paid or performed in full. All indemnification obligations in the Loan Documents survive the termination of the Loan Documents and payment and performance of the Obligations in full. In addition, certain provisions of the Loan Documents remain in effect even after all Obligations are irrevocably paid and performed in full. In recognition of among other things, Borrowers' indemnification obligations and Lender's right to have its attorneys' fees and other expenses incurred in connection with this Agreement secured by the Collateral, notwithstanding payment in full of all Obligations by Borrower, Lender shall not be required to record any terminations or satisfactions of any of its liens on the Collateral unless and until Borrowers and all other Loan Parties have executed and delivered to Lender a general release in a form acceptable to Lender in its discretion. Each Borrower understands that this provision constitutes a waiver of rights it may have under §9-513 of the UCC.

12.8    **Notice.** Any notice or request may be given to Borrowers or to Lender at their addresses stated on the signature page hereto (or at such other address as may be specified in writing). Any notice,

17

Docusign Envelope ID: 1FC4C6F7-8CCC-44E5-80B0-715947205D8C

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

request, demand, direction, or other communication (for purposes of this Section only, a "Notice") to be given to or made on any party under any provision of the Loan Documents must be given or made in writing (which includes by means of electronic transmission (i.e., "email") or facsimile transmission). Any Notice given to Borrower is treated as having been given to each other Loan Party. Any Notice is effective by either party if sent in writing or facsimile transmission with confirmation of receipt or by certified mail or personal delivery or expedited mail services to the addresses forth their respective signature block below.

12.9    **Joint and Several Obligations.**  If more than one person or entity is named as Borrower in this Agreement, all Obligations, representations, warranties, covenants and indemnities of Borrower set forth herein and in the other Loan Documents shall be the joint and several obligations of such Persons. Each Borrower hereby appoints each other Borrower as its true and lawful attorney-in-fact, with full right and power, for purposes of exercising all rights of such person under this Agreement and applicable law with regard to the transactions contemplated under this Agreement.  The foregoing is a material inducement to the agreement of Lender to enter into this Agreement and to consummate the transactions contemplated under this Agreement.  Each Borrower represents that (i) it will receive a direct economic and financial benefit from the obligations incurred under this Agreement, (ii) all Borrowers are directly dependent upon each other for, and in connection with, their respective business activities and financial resources, and (iii) the incurrence of the obligations under this Agreement is in the best interest of such Borrower.

12.10    **General Matters.**

(a)    Notwithstanding that Borrowers are jointly and severally liable for all Obligations, if for any reason the Borrowers are found in a final, non-appealable order not to be jointly and severally liable for all Obligations, then provisions of this Section 12.10 apply and Borrower absolutely and unconditionally guarantees to Lender, the full and prompt payment (whether at stated maturity, by acceleration, or otherwise) and performance of all Obligations.  Borrower's guaranty obligation is in addition to all other guaranty obligations and is a payment and performance guaranty (and not a collection guaranty), and its obligations under this Section 12.10 are absolute and unconditional, irrespective of, and not affected by (i) the genuineness, validity, regularity, enforceability or any future amendment of, or change in, any other Loan Document or any other document to which the other Loan Parties are or may become a party; (ii) Lender not enforcing the Loan Documents; (iii) the existence, value, release, or condition of any Collateral, or Lender releasing any Person liable for the Obligations; or (iv) any other action or circumstances that could be a legal or equitable defense of a surety or guarantor.

(b)    Lender does not have to proceed against any other Person (including any other Loan Party) or any Collateral before requiring payment by any one or more of the Loan Parties.

(c)    Borrower waives and agrees that it may not at any time insist on, plead, or claim, or take the benefit or advantage of any laws, claims, or doctrines related to appraisal, valuation, stay, extension, marshaling, redemption, or exemption. Borrower waives with respect to any of the Obligations: (1) all defenses with respect to diligence, presentment, demand, maturity, extension of time, change in nature or form of the Obligations, acceptance, release of security, composition, or agreement arrived at as to the amount of, or the terms of, the Obligations; (2) notice of adverse change in the other Loan Parties' financial condition; and (3) any other fact that might increase the risk to that Loan Party. Borrower also waives the benefit of all provisions of law that are or might be in conflict with the terms of

18

Docusign Envelope ID: 1FC4C6F7-BCCC-44E5-80B0-715947205D8C

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

this Section 12.10. Borrower represents, warrants, and agrees that its obligations under this Section 12.10 are not and will not be subject to any setoffs, defenses, or counterclaims. Borrower's obligations under this Section 12.10 remain in full force and effect until the Obligations have been irrevocably paid and performed in full and the Loan Documents have been terminated (other than contingent obligations with respect to which no claim has been asserted or threatened). Borrower is in the same position as a principal debtor with respect to the Obligations and expressly waives all rights it has and may have to require that Lender proceed against any other Loan Party or any Collateral before proceeding against, or as a condition to proceeding against, that Loan Party. The parties acknowledge that, but for the provisions of this Section 12.10 (including the waivers), Lender would not enter into the Loan Documents.

(d)    Notwithstanding anything to the contrary in this Agreement or in any other Loan Document, until the Obligations are irrevocably paid and performed in full (other than contingent obligations with respect to which no claim has been asserted or threatened), Borrower (i) irrevocably subordinates and defers all rights at law or in equity to subrogation, reimbursement, exoneration, contribution, indemnification, setoff, or any other rights that a surety could have against a principal, a guarantor, a maker, a co-maker, an obligor, an accommodation party, a holder, a transferee, and that a Loan Party may have against any Person (including another Loan Party) in connection with or as a result of a Loan Party performing its obligations under the Loan Documents or any other agreements; (ii) irrevocably subordinates and defers any "claim" (as defined in the Bankruptcy Code) against any Person (including the other Loan Parties and any surety for any of the Obligations), either directly or as an attempted set off to any action instituted by Lender against any Person (including the other Loan Parties); and (iii) acknowledges and agrees (x) that this subordination and deferral is intended to benefit Lender and does not limit or otherwise affect that Loan Party's liability or the enforceability of this Section 12.10 and (y) that Lender and its respective successors and assigns are intended third-party beneficiaries of the waivers and agreements set forth in this Section 12.10.

12.11    **Successors and Assigns.**  This Agreement inures to the benefit of, and is binding on, the respective successors and permitted assigns of each Loan Party, Lender, and their respective successors and assigns.

12.12    **Waivers.**  Each Borrower waives (1) all rights with respect to subrogation, reimbursement, indemnity, exoneration, contribution, or any other claim that has or could have against the other Loan Parties or other Person directly or contingently liable for the Obligations, or against or with respect to the other Person's (including any Loan Party's) property (including, any property that is Collateral for the Obligations), arising in connection with the Loan Documents, until the Loan Documents are terminated and the Obligations are irrevocably paid and performed in full (other than contingent obligations with respect to which no claim has been asserted or threatened) and (2) any defense it may otherwise have to paying and performing the Obligations based on any contention that its liability under the Loan Documents is limited and not joint and several. The preceding waivers and all other waivers in the Loan Documents are a material inducement to Lender's agreement to enter into the Loan Documents and to make Advances and other Loans.

12.13    **Severability.**  If any part of the Loan Documents is found for any reason to be unenforceable, all other parts nevertheless remain enforceable.

19

Docusign Envelope ID: 1FC4C6F7-BCCC-44E5-80B0-715947205D8C

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

12.14    **Injunctive Relief.** If any Loan Party does not perform, observe, or discharge its obligations or liabilities under the Loan Documents (or threatens to fail or refuse to perform, observe, or discharge its obligations or liabilities) any remedy at law may prove to be inadequate relief to Lender. Therefore, Lender is entitled to temporary and permanent injunctive relief in any such case without the necessity of proving that actual damages are not an adequate remedy.

12.15    **Consequential Damages.** Under no circumstances is Lender, its Affiliates, its agents, or its attorneys liable to any Borrower for any special, incidental, consequential, or punitive damages (including those arising from any breach of contract, tort, or other wrong relating to the Obligations, the Loan Documents, the Collateral, any banking product, or any agreement between Lender and any one or more of the Borrowers).

12.16    **Counterparts; Signature Transmission.** The Loan Documents may be executed in any number of counterparts with the same effect as if all signatories had signed the same document. All counterparts must be construed together to constitute one instrument. Any signature delivered by facsimile or email transmission is treated as an original signature.

12.17    **Construction.** Each party and its counsel have reviewed this Agreement. Accordingly, the normal rule of construction that any ambiguities are resolved against the drafting party does not apply in interpreting this Agreement or any other Loan Document, or any amendment, schedules, or exhibits to this Agreement and the other Loan Documents.

12.18    **Confidentiality and Sharing Information.** Lender will hold all non-public confidential information obtained by them from the Loan Parties in accordance with their customary procedures for handling confidential information, but they may disclose, without notice to any Loan Parties, confidential information: (1) to their examiners, Affiliates, agents, employees, outside auditors, counsel, and other professional advisors; (2) to potential assignees of or participants in Lender's interest in the Loans; (3) to any party that executes a non-disclosure agreement with Lender; (4) as required or requested by any Governmental Body (or its representatives); (5) under legal process; or (6) as otherwise required by law, regulation, or court order.

12.19    **Publicity.** Each Borrower authorizes Lender to publicly announce the financial arrangements entered into among the Borrowers and Lender (including announcements that are commonly known as tombstones) in any form and media Lender determines.

12.20    **Conflict.** If there is any conflict, inconsistency, or discrepancy between the provisions of this Agreement and the provisions of the other Loan Documents, the provisions giving Lender greater rights or remedies (as determined by Lender) govern to the maximum extent not prohibited by applicable law (it being understood that the purpose of this Agreement and any Loan Document is to add to, and not to limit, detract, or derogate from, diminish, or otherwise impair or reduce the rights granted to Lender in this Agreement or the Loan Documents).

12.21    **USA Patriot Act.** Lender, pursuant to the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act") hereby notifies each Loan Party that pursuant to the requirements of the Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow Lender to identify each Loan Party in accordance with the Act, and each Borrower agrees to provide, or cause the other Loan Parties to provide, such information from time to time to Lender.

12.22    **No Liability.** Nothing in this Agreement makes Lender any Borrower's agent for any purpose, and Lender does not assume any of any Borrower's obligations under any contract or agreement

20

Docusign Envelope ID: 1FC4C6F7-BCCC-44E5-80B0-715947205D8C

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

assigned to Lender. Lender is not responsible or liable for any reason for any shortage, discrepancy, damage, loss, warranty claim or destruction of any Collateral.

   12.23   **Power of Attorney.** Each Borrower irrevocably appoints Lender, or any person(s) designated by Lender as its attorney-in-fact, which appointment is coupled with an interest and shall remain in full force and effect until all Obligations of Borrowers to Lender have been fully satisfied and discharged, with full power, at Borrowers' sole expense, to exercise at any time in Lender's discretion all or any of the following powers: (a) receive, take, endorse, assign, deliver, accept, and deposit, in the name of Lender or Borrowers (or any of them), any and all cash, checks, commercial paper, drafts, remittances, and other instruments and documents relating to the Collateral or the proceeds thereof; (b) change a Borrower's address and place Legends on all invoices and statements relating to an Account mailed or to be mailed to such Borrower's customers and to substitute thereon the address designated by Lender, and to receive and open all mail addressed to such Borrower (including under Borrower's Tradenames), at Lender's address, or any other designated address; (c) upon and after the occurrence of an Event of Default, to change the address for delivery of a Borrower's mail to Lender's or an address designated by Lender, and to sign any forms on behalf of such Borrower to affect this change; (d) upon and after the occurrence of an Event of Default, take or bring, in the name of Lender or any Borrower, all steps, actions, suits or proceedings deemed by Lender necessary or desirable to effect collection of or other realization upon any Collateral; (e) execute on behalf of any Borrower any notices or other documents necessary or desirable to carry out the purpose and intent of this Agreement, and to do any and all things reasonably necessary and proper to carry out the purpose and intent of this Agreement; (f) transfer any lockboxes belonging to any Borrower to Lender; (g) initiate ACH transfers from any Borrower's depository accounts; (h) endorse and take any action with respect to bills of lading covering any inventory; (i) upon and after the occurrence of an Event of Default, or at any time if any Borrower fails to do so within a reasonable time, execute, file and serve, in its own name or in the name of such Borrower, mechanics lien or similar notices, or claims under any payment or performance bond for the benefit of such Borrower; (j) upon and after the occurrence of an Event of Default, or at any time if any Borrower fails to do so within a reasonable time, pay any sums necessary to discharge any lien or encumbrance on the Collateral (including taxes and assessments), which sums shall be included as Obligations hereunder, and which sums may, at Lender's discretion, accrue interest at the Default Rate until paid in full; and (k) negotiate any and all claims under all insurance policies relating to Collateral and the interruption of Borrower's business and Lender also has the power to negotiate any payments on the insurance policies.

   12.24   **Electronic Signatures.** Each party agrees that an Electronic Signature of such party affixed to this Agreement, any of the other Loan Documents, and to any amendment, supplement or other modification to such Loan Documents, or any other document or instrument delivered by such party in connection with the Loan Documents or any of the transactions contemplated thereby is intended to authenticate such writing and shall have the same force and effect as if it had been manually signed and physically delivered by such party. Upon request, each Borrower agrees to provide a manually executed counterpart of any Loan Document or other applicable document related to the Loan Documents previously executed by Electronic Signature.


Refer to the Revolving Loan Schedule for any additional Miscellaneous provisions.


**[Remainder of Page Intentionally Left Blank – Signature Pages Follow]**

172386060v2

Docusign Envelope ID: 1FC4C6F7-BCCC-44E5-80B0-715947205D8C

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

Borrower(s), Guarantor(s) and Lender entered into this Agreement on the Closing Date.

**BORROWER:**

C.D.S. Moving Equipment, Inc.,
a California corporation

By: Michael Dennis Barwick
Name: Dennis Barwick
Its: President

Address for notices:
375 W. Manville St.
Compton, California 90220
Phone: (800) 225-3659
Email: dbarwick@cds-usa.com

**LENDER:**

Pathward, National Association

By: Seth Alexander
Name: Seth Alexander
Its: VP

Address for notices:

Pathward, National Association
5480 Corporate Drive, Ste. 350
Troy, Michigan 48098
Attention: Legal Department
Tel: (248) 641-5100
Email: legalnotice@pathward.com

Signature Page to Credit and Security Agreement

172386060v2

Docusign Envelope ID: 1FC4C6F7-BCCC-44E5-80B0-715947205D8C

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

## ANNEX 1
## DEFINITIONS

The terms below have the following meanings:

"Account Debtor" means any person who is obligated on any Account of a Borrower.

"Act" is defined in Section 12.21.

"Advance" means an advance of the Revolving Loan.

"Advance Formula" has the meaning set forth in Section 2.1(d) of the Revolving Loan Schedule.

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with such Person. For purposes of this definition, "control" of a Person means the power, directly or indirectly, (x) to vote 25.0% or more of the Equity Interests of such Person, or (y) to direct or cause the direction of the management or policies of such Person.

"Anti-Terrorism Laws" means all laws and sanctions relating to terrorism or money laundering (including Executive Order No. 13224, the USA Patriot Act (Public Law 107-56), the Bank Secrecy Act (Public Law 91-508), the Trading with the Enemy Act (50 U.S.C. Section 1, et seq.), the International Emergency Economic Powers Act (50 U.S.C. Section 1701 et seq.), and the related sanction regulations promulgated by the Office of Foreign Assets Control, as well as laws relating to prevention and detection of money laundering in 18 U.S.C. Sections 1956 and 1957).

"Availability" means, as of any date of determination, the amount that Borrowers are entitled to borrow as Revolving Loans under Section 2.1 of this Agreement.

"Bankruptcy Code" means Title 11 of the United States Code or any similar federal or state debtor relief laws.

"Beneficial Owner" means, with respect to each Loan Party: (1) each individual, if any, that, directly or indirectly, owns 25% or more of that Loan Party's Equity Interests; and (2) a single individual with significant responsibility to control, manage, or direct that Loan Party.

"Beneficial Ownership Certificate" means a certificate, for each Loan Party, acceptable to Lender in its Discretion, certifying, among other things, the Beneficial Owner of each Loan Party.

"Business Day" means any day other than Saturday, Sunday, a legal holiday on which commercial banks are authorized or required by law to be closed in Michigan, or any other day Lender is closed for transacting business.

"Code" means the Internal Revenue Code of 1986.

"Collateral" is defined in Section 4.1. "Collateral" also includes all property of any Person that at any time secures any of the Obligations.

"Debtor" is defined in Section 4.6(a).

"Default" means any event or circumstance that, with notice, the passage of time, or both, would be an Event of Default.

Docusign Envelope ID: 1FC4C6F7-BCCC-44E5-80B0-715947205D8C

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

"Discretion" means a determination made in good faith in the exercise of Lender's business judgment (from the perspective of a secured, asset-based lender). The burden of establishing that Lender did not act in its Discretion is on Borrowers.

"Electronic Signature" means any electronic sound, symbol, or process attached to or logically associated with a record and executed or adopted by a party with the intent to sign such record.

"Eligible Accounts" means, at any time, Accounts owned by a Borrower that Lender determines in its discretion are Eligible Accounts. Without limiting Lender's discretion, Eligible Accounts does not include any Account:

a) That is not subject to a first-priority perfected Lien in Lender's favor;

b) That is subject to any Lien (other than a Permitted Lien that does not have priority over Lender's Lien);

c) That is owed by an Account Debtor that is an Affiliate, officer, employee, or agent of any Borrower or has common shareholders, officers, or directors with any Borrower;

d) That is: (i) unpaid more than 90 days after the original invoice date, except for the Account Debtor Crown Moving is unpaid more than 120 days after the original invoice date, (ii) invoiced more than 10 days after the date of sale or service, or (iii) contains payment terms of greater than 90 days from the date of invoice;

e) That is owing by an Account Debtor which, as of the date of determination, has failed to pay 25% or more of the aggregate amount of its Accounts owing to any Borrower within 90 days since the original invoice date, except for the Account Debtor Crown Moving has failed to pay 25% or more of the aggregate amount of its Accounts owing to any Borrower within 120 days since the original invoice date, corresponding to such Accounts;

f) With respect to which any covenant, representation, or warranty in any Loan Document has been breached or is not true;

g) That: (i) does not arise from the sale of goods or performance of services in the ordinary course of business; (ii) is contingent upon a Borrower's completion of any further performance (including "pre-billed" Accounts); (iii) is a sale on a bill-and-hold, guaranteed sale, sale-and-return, sale on approval, consignment, cash-on-delivery, any repurchase or return basis, or any other similar basis; or (iv) is a cash sale (including COD) or credit card sale;

h) With respect to which the Account Debtor is the United States or any department, agency or instrumentality of the United States; provided, however, that an Account shall not be deemed ineligible by reason of this clause if Borrowers have completed all of the steps necessary, in the discretion of Lender, to comply with the Federal Assignment of Claims Act of 1940 (31 U.S.C. Section 3727) with respect to such Account;

i) That is owed by an Account Debtor that is any state of the United States or any city, town, municipality, county or division thereof;

j) With respect to which the Account Debtor is not a resident of the United States or Canada (provided, however, all Accounts originating from the Province of Quebec are ineligible);

k) That is owed by an Account Debtor that has admitted in writing its inability (or is generally unable) to pay its debts as they become due, is insolvent, or is the subject of a bankruptcy, receivership or similar proceeding;

l) That is owed in any currency other than U.S. Dollars;

m) That is owed by an Account Debtor that is a creditor or supplier of any Borrower, or that is otherwise subject to a potential offset, counterclaim, deduction, discount, recoupment,

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

Docusign Envelope ID: 1FC4C6F7-BCCC-44E5-80B0-715947205D8C

reserve, defense, chargeback, credit, allowance or adjustment (but ineligibility is limited to the amount thereof);

n)    That represents a progress billing or retainage, or relates to services for which a performance, surety or completion bond, or similar assurance has been issued;

o)    That is evidenced by a promissory note, chattel paper, or an instrument;

p)    That does not comply in all material respects with all laws and regulations imposed by any Governmental Body;

q)    That is disputed; or

r)    That is an Account owed by an Account Debtor that is deemed unacceptable by Lender in its discretion.

In determining the amount of Eligible Accounts, Lender may reduce the face amount of Accounts by (i) all accrued and actual discounts, claims, credits, pending credits, promotional program allowances, price adjustments, finance charges, or other allowances and (ii) the aggregate amount of all cash received with respect to Accounts but not yet applied by Borrowers to reduce Accounts.

"Eligible Inventory" means, at any time, Inventory owned by a Borrower that Lender in its discretion determines is Eligible Inventory. Without limiting Lender's Discretion, Eligible Inventory does not include any Inventory:

a)    That is not subject to a first-priority perfected Lien in Lender's favor;

b)    That is subject to any Lien (other than a Permitted Lien that does not have priority over Lender's Lien);

c)    With respect to which any covenant, representation, or warranty in any Loan Document has been breached or is not true;

d)    That (i) is not finished goods; (ii) is, in Lender's discretion, slow moving, obsolete, unfit for sale, or not salable in the ordinary course of business; (iii) has been received by a Borrower on a consignment, guaranteed sale or other similar basis; (iv) has been placed with a Person on a consignment or other similar basis; or (v) is subject to any Person's claims (other than a Borrower); or

e)    That (i) is not located in the United States; (ii) is not located at a location owned or leased by a Borrower and, with respect to any leased location, the lessor has not delivered to Lender a Waiver (or Lender in its discretion has established a Reserve for that location) or is not in any third-party warehouse or in a bailee's possession and the warehouseman or bailee has not delivered to Lender a Waiver and such other documentation as Lender may require in its discretion (or Lender in its discretion has established a Reserve for that location); (iii) is being processed offsite at a third-party location or outside processor, or is in transit to or from a third party location or outside processor (unless the processor has delivered to Lender a Waiver and such other documentation as Lender may require or Lender in its discretion has established a Reserve for that Inventory); (iv) does not comply with all standards, laws, and regulations imposed by any Governmental Body; (v) does not comply with all standards imposed by any insurer; or (vi) is subject to any license or other agreement which would restrict or otherwise limit Borrowers' or Lender's ability to sell the Inventory; or

f)    That is deemed unacceptable by Lender in its discretion.

"Environmental Laws" means all federal, state, and local environmental, land use, zoning, health, and safety laws, statutes, ordinances, and codes related to protecting the environment or governing the use, storage, treatment, generation, transportation, processing, handling, production, or disposal of Hazardous Substances.

3

Docusign Envelope ID: 1FC4C6F7-BCCC-44E5-80B0-715947205D8C

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, or other equity ownership interests in a Person (and any warrants, options, or other rights entitling the holder to purchase or acquire any equity ownership interest), but excluding any debt securities convertible into any of the foregoing.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any Person who for purposes of Title IV of ERISA is a member of a Borrower's controlled group of corporations (as defined in 26 U.S.C. § 1563), or under common control with such Borrower, within the meaning of Section 414 of the Code.

"Event of Default" is defined in Article 9.

"Executive Order No. 13224" means the Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001.

"Expenses" means all reasonable fees (including attorneys' fees), costs, expenses, charges, and out-of-pocket disbursements incurred by Lender and its counsel and court costs, in any way arising from or in connection with the Loan Documents (including due to any Loan Party not performing or complying with its obligations under any Loan Document), any Collateral (including those associated with Section 4 and Section 6 of this Agreement), any Obligations, or the business relationship between Lender and any Loan Party.

"GAAP" means the generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and the Financial Accounting Standards Board and that are applicable to the circumstances as of the date of determination and applied on a consistent basis.

"Governmental Body" means any nation or government, any state or other political subdivision of a nation or government, or any entity exercising the legislative, judicial, regulatory, or administrative functions of or pertaining to a government.

"Guarantor" means, individually and collectively and jointly and severally, each Person that guarantees all or any Obligations.

"Guaranty" collectively means the guaranty agreements executed and delivered by the applicable Guarantor in favor of Lender, with respect to the Obligations, in each case as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"Hazardous Substance" means any Hazardous Wastes, or Toxic Substances, or related materials as used or defined in any applicable Environmental Law.

"Hazardous Wastes" means all waste materials regulated by the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. Section 9601 et seq.), the Resource Conservation and Recovery Act of 1976 (42 U.S.C. Section 6901 et seq.), or applicable state law, and any other applicable federal and state laws relating to hazardous waste disposal.

"Indebtedness" of any Person means, as of any date, the sum, whether off-balance sheet or otherwise, of: (1) all indebtedness or liabilities of such Person for borrowed money (including, without limitation, obligations evidenced by bonds, debentures, notes, or other similar instruments); (2) obligations for the deferred purchase price of property or services; (3) obligations under letters of credit; (4) all guaranties and

4

Docusign Envelope ID: 1FC4C6F7-BCCC-44E5-80B0-715947205D8C

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

other contingent obligations to purchase, to supply funds, or otherwise to assure a creditor against loss; (5) obligations under capital leases; and (6) obligations secured by any Liens, whether or not the obligations have been assumed (other than Permitted Liens).

"Insolvency Proceeding" means any proceeding under any provision of the Bankruptcy Code or under any other bankruptcy or insolvency law (including assignments for the benefit of creditors or other proceedings seeking reorganization, liquidation, arrangement, or other similar relief).

"Lender" is defined on page 1.

"Lien" means any mortgage, deed of trust, pledge, hypothecation, assignment, security interest, lien (whether statutory or otherwise), charge, claim, encumbrance or other security arrangement held or asserted with respect to any asset.

"Loan" means each Revolving Loan, and "Loans" means all Revolving Loans.

"Loan Documents" means this Agreement (including the Revolving Loan Schedule), the Note, each Guaranty, the Perfection Certificate (if applicable), each Borrowing Base Certificate (if applicable), each Covenant Compliance Certificate (if applicable), the Beneficial Ownership Certificate, the Waivers, the Subordination Agreements, and any and all other agreements, instruments, documents, including pledges, mortgages and deeds of trust, powers of attorney, consents, and all other writings before, now, or later executed by any Loan Party or delivered to Lender with respect to the transactions contemplated by any of the foregoing documents, in each case as amended from time to time in accordance with the terms thereof.

"Loan Party" means each Borrower, each Guarantor and each Person that grants Lender a Lien on any Collateral to secure any Obligation.

"Lockbox Account" means the remit-to address on all documents related to collection of the Accounts, including the lockbox address or pursuant to the wire transfer or ACH instructions set forth in Section 4.6 of the Revolving Loan Schedule.

"Material Adverse Effect" means a material adverse effect in or on: (1) any Loan Party's financial condition, operational results, business, or prospects; (2) any Loan Party's ability to pay or perform any Obligation in accordance with its terms; (3) the value of the Collateral or the priority of Lender's Lien on any Collateral; or (4) the validity or enforceability of any Loan Document or Lender's rights or remedies under any Loan Document.

"Maximum Borrowing Amount" means, at any time, an amount equal to the lesser of (1) the Maximum Revolving Loan Amount minus all Reserves that could require a cash expenditure by Lender and (2) the Advance Formula.

"Maximum Revolving Loan Amount" is defined in Section 3.2.

"Multiemployer Plan" means a multiemployer plan (as defined in Section 4001(a)(3) of ERISA) to which any Borrower or any ERISA Affiliate contributes or is obligated to contribute.

"Note" means the Revolving Note.

"Notice" is defined in Section 12.8.

Docusign Envelope ID: 1FC4C6F7-BCCC-44E5-80B0-71594720 5D8C

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

"Obligations" means any and all loans, advances, debts, liabilities, obligations, covenants, indemnities, and duties (absolute, contingent, matured, or unmatured) owing by any one or more of the Loan Parties to Lender (or to any of its direct or indirect Subsidiaries or Affiliates) arising under any Loan Document or otherwise, of any kind or nature, present or future (including any interest accruing after maturity or the filing of any petition in bankruptcy, or the commencement of any Insolvency Proceeding relating to any Loan Party, whether a claim for post filing or post-petition interest is allowed in that proceeding), whether direct or indirect, absolute or contingent, joint or several, due or to become due, now existing or hereafter arising, contractual or tortious, liquidated or unliquidated, and any amendments, extensions, renewals, or increases and all Expenses Lender incurs in the documentation, negotiation, modification, enforcement, collection, or otherwise in connection with any of the preceding, and all obligations of any Loan Party to Lender to perform acts or refrain from taking any action.

"parent" is defined in the defined term "Subsidiary".

"Pension Plan" means a pension plan (as defined in Section 3(2) of ERISA) maintained for employees of any Borrower or any ERISA Affiliate and covered by Title IV of ERISA.

"Permitted Liens" means (1) Liens in favor of Lender; (2) Liens for taxes, assessments, or other charges that (x) are not delinquent or (y) are being contested in good faith by appropriate proceedings that stay the enforcement of those Liens and with respect to which proper reserves have been taken by Borrowers in accordance with GAAP (but only if these Liens have no effect on the priority of Lender's Liens or the value of the Collateral, and a stay of enforcement of the Lien is in effect); (3) mechanics', workers', materialmen's, warehousemen's, common carriers', landlord's or other similar Liens arising in the ordinary course of any Borrower's business with respect to obligations that are not due or that are being contested in good faith by the applicable Borrower; (4) Liens in favor of creditors if the liens are subject to a Subordination Agreement / Intercreditor Agreement in form and substance satisfactory to Lender in its Discretion; and (5) Liens reflected on the UCC-1 Financing Statements bearing file numbers U22160131011, U250110380421, U220249295538, U220249299243, 19-7753697761 (but only if the principal amount secured as of the Closing Date is not increased and no additional assets become subject to the Lien).

"Person" means any individual, sole proprietorship, partnership, corporation, business trust, joint stock company, trust, unincorporated organization, association, limited liability company, institution, public benefit corporation, joint venture, entity, or Governmental Body.

"Plan" means an employee benefit plan (as defined in Section 3(3) of ERISA) maintained for employees of any Borrower or any ERISA Affiliate.

"Prepayment Fee" is defined in Section 3.1 D of the Revolving Loan Schedule.

"Real Property" means Borrowers' owned and leased real property.

"Reportable Event" means a reportable event (as defined in Section 4043 of ERISA), other than an event for which the 30-day notice requirement under ERISA has been waived in regulations issued by the PBGC.

"Reserves" means any reserves that Lender in its discretion deems necessary to maintain with respect to the Collateral or any Borrower.

"Responsible Representative" means a Person's president, chief executive officer, chief financial officer, manager or authorized member (in the case of a limited liability company) or any other individual approved in writing by Lender in its Discretion.

Docusign Envelope ID: 1FC4C6F7-BCCC-44E5-80B0-715947205D8C

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

"Revolving Loan" means a Loan made under Section 2.1.

"Revolving Loan Fee" is defined in Section 3.1 A. of the Revolving Loan Schedule.

"Revolving Loan Outstanding" means, at any time the aggregate amount of outstanding principal, accrued and unpaid interest, fees and costs and expenses (including reasonable attorneys' fees) due in connection with to the Revolving Loans.

"Revolving Loan Schedule" means the Revolving Loan Schedule attached hereto as Exhibit A and made a part hereof.

"Revolving Loan Termination Date" means the date that Lender, in its discretion, demands payment of the Obligations.

"Revolving Note" means, individually and collectively, any and all promissory notes evidencing the Revolving Loan.

"Specified Balance" is defined under Section 3.1 C(a)(ii) of the Revolving Loan Schedule.

"Subordinated Debt Documents" means any instruments, agreements and documents evidencing or relating to any Subordinated Debt.

"Subordinated Debt" means all Indebtedness of Borrowers, or any of them, that is subordinated to the prior payment and satisfaction of the Obligations pursuant to a Subordination Agreement.

"Subordination Agreement" means any intercreditor and/or subordination agreement in form and substance satisfactory to Lender in its Discretion (i) by and between a subordinating creditor and Lender or (ii) by and among Borrowers, a subordinating Creditor and Lender, pursuant to which Subordinated Debt is subordinated to the prior payment and satisfaction of the Obligations and the Liens securing such Subordinated Debt, if any, granted by Borrowers to such subordinated creditor are subordinated to the Obligations and the Liens created hereunder and under any other Loan Document.

"Subsidiary" means, with respect to any Person (the "parent") at any date, any Person of which Equity Interests representing more than 50% of the Equity Interests or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of that date, owned, controlled, or held, or (2) that is, as of such date, otherwise controlled, by the parent or one or more Subsidiaries of the parent.

"Toxic Substances" means any material that has been shown to have an adverse effect on human health or that is subject to regulation under the Toxic Substances Control Act (TSCA), 15 U.S.C. Section 2601 et seq., applicable state law, or any other present and future applicable Federal or state laws related to toxic substances, and includes asbestos, polychlorinated biphenyls (PCBs) and lead based paints.

"Tradenames" is defined in Section 5.7.

"UCC" means the Uniform Commercial Code as in effect from time to time in Michigan (but if the law, perfection, or the effect of perfection or non-perfection of any Lien on any Collateral is governed by the Uniform Commercial Code in effect in a different jurisdiction, "UCC" means the Uniform Commercial Code as in effect in that other jurisdiction with respect to perfection or the effect of perfection or non-perfection).

Docusign Envelope ID: 1FC4C6F7-BCCC-44E5-80B0-715947205D8C

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

"USA Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56.

"Waivers" means all landlord's waivers, warehouseman's waivers, creditor's waivers, mortgagee waivers, processing facility and bailee waivers, and customs broker waivers that are executed and delivered in connection with this Agreement.

8

Docusign Envelope ID: 1FC4C6F7-BCCC-44E5-80B0-715947205D8C

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

**Exhibit A**

## REVOLVING LOAN SCHEDULE TO
## CREDIT AND SECURITY AGREEMENT

This Revolving Loan Schedule is part of the Credit and Security Agreement dated  May 7  , 2025 between:

> PATHWARD, NATIONAL ASSOCIATION
> 5480 CORPORATE DRIVE, SUITE 350
> TROY, MICHIGAN 48098

AND

> C.D.S. MOVING EQUIPMENT, INC.
> 375 W. MANVILLE ST.
> COMPTON, CALIFORNIA 90220

The following Article and Section numbers correspond to Article and Section numbers contained in the Agreement.

## ARTICLE 1
## DEFINITIONS

1.2    **General Terms**. The following terms have the following meanings:

"Borrowing Base Certificate" means a certificate executed by a Responsible Representative of Borrowers that is appropriately completed and in the form provided by Lender to Borrowers.

"Excluded Collateral" Reserved.

## ARTICLE 2
## LOANS, PAYMENTS

2.1    **Revolving Loans.**

(d)    "Advance Formula" means, at any time, the sum of:

(A)    ninety percent (90%) of Eligible Accounts, plus

(B)    the lesser of (i) fifty percent (50%) of Eligible Inventory, (ii) one hundred and twenty five percent (125%) of subpart (A) above from May 1 through October 31 of each year, and two hundred percent (200%) of subpart (A) above from November 1 through April 30 of each year, and (iii) $3,000,000.00, minus

(C)    all Reserves.

2.2    **Loan Repayment**.

(b)    On the date a Borrowing Base Certificate is received on the net funds actually received, Borrowers will receive immediate credit on such funds for purposes of determining Availability for Advances.

v_8.2023

172390512v6

Docusign Envelope ID: 1FC4C6F7-BCCC-44E5-80B0-715947205D8C

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

## ARTICLE 3
## FEES

3.1    **Loan Fees.**  Borrower will pay Lender the following fees:

A.    **Revolving Loan Fee.** On the Closing Date and on each one-year anniversary of the Closing Date, Borrowers shall pay Lender a fee on the Revolving Loan facility in the aggregate amount of one percent (1.0%) of the Maximum Revolving Loan Amount (the "Revolving Loan Fee"), which will be fully earned and non-refundable as of the Closing Date and each such one-year anniversary date.

B.    **Documentation and Attorneys' Fees**. In consideration of the extension of the Loans and the execution of this Agreement, Borrowers will pay Lender its fees and costs (including, without limitation, attorneys' fees) incurred in documenting the Loans, plus Lender's attorneys' fees and costs from time to time incurred thereafter in connection with the Loans.

C.    **Loan Administration Fees.**

(a)    Loan Maintenance Fees.

(i)    Revolving Loan Maintenance Fee.  Waived.

(ii)    Specified Balance.  If the actual average outstanding principal balance of the Revolving Loans in any month is less than $2,500,000.00 (the "Specified Balance"), Borrowers shall pay interest on the Revolving Loan for such month calculated as if the average outstanding principal balance of the Revolving Loans were the Specified Balance.

(b)    Late Reporting Fee.  Borrowers shall pay Lender a fee in an amount equal to $150.00 per document in connection with the late delivery of any report, financial statement or schedule required by the Agreement.

(c)    Lockbox Fee.  Each month Borrowers shall pay all costs in connection with the lockbox and the Lockbox Account, as determined by Lender from time to time.

(d)    Collateral Monitoring Fee. Waived.

D.    **Prepayment Fee**. Borrowers may elect to prepay the Loans and/or terminate this Agreement at any time, but only upon payment of all Loans and permanent reduction of the Maximum Revolving Loan Amount and the Prepayment Fee.  If an Event of Default has occurred and is continuing at the time Lender demands payment of the Loans, the Prepayment Fees will be due and payable by Borrowers.

The Prepayment Fee is:  (i) prior to the one year anniversary date of the Closing Date, two percent (2.0%) of the Maximum Revolving Loan Amount prior to repayment and reduction, and (ii) on and after the one year anniversary date of the Agreement but prior to the two year anniversary date of the Agreement, one percent (1.0%) of the Maximum Revolving Loan Amount prior to repayment and reduction. The one percent (1.0%) Prepayment Fee shall renew on the two year anniversary date of the Agreement for an additional twelve (12) months unless (i) Borrower notifies Lender in writing not more than 90 and not less than 60 days

v_8.2023

2

172390512v6

Docusign Envelope ID: 1FC4C6F7-BCCC-44E5-80B0-715947205D8C

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

before such anniversary date of Borrower's intention to terminate the Agreement and (ii) the Obligations are paid in full by such anniversary date.

## ARTICLE 4
## COLLATERAL

4.6     The Lockbox Account includes the following:

If by mail:
Drawer #3431
PO Box 5935
Troy, Michigan 48007-5935

If by ACH or wire transfer
Bank Name:    Pathward, National Association
ABA #:         072413764
Account #:     8002253659
Reference:    C.D.S. Moving Equipment, Inc.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES

Each Borrower further represents and warrants that:

5.2     Borrower's organizational identification number, state of organization, and states where it is qualified and authorized to do business, and Borrower's subsidiaries and affiliates are as follows:

(a)    Organizational Identification Number: 95-4180729

(b)    State of Organization: California

(c)    States where Borrower is qualified and authorized to do business in: All states.

(d)    Borrower's Subsidiaries or other Affiliates are: N/A.

5.7     During the last five years the Loan Parties have:

(a)    Sold Inventory under the following other names: CDS Packaging Solutions and CDS Moving & Equipment

(b)    Been the surviving entity of the following Merger and Consolidation with Information or Materially Acquired the Assets of: N/A

(c)    Used the following fictitious names, d/b/a, tradename, tradestyle, or other name: CDS Packaging Solutions and CDS Moving & Equipment

5.8     Below are the Borrowers':

(a)    Chief Executive Office Location: 375 W. Manville St., Compton, CA 90220

(b)    Equipment and Inventory Locations: 375 W. Manville St., Compton, CA 90220

(c)    Other Collateral and Books and Records Locations: 375 W. Manville St., Compton, CA 90220

5.10    As to each Loan Party:

v_8.2023

3

172390512v6

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

Docusign Envelope ID: 1FC4C6F7-BCCC-44E5-80B0-715947205D8C

(a)    Litigation, Investigations, Arbitration, Actions or Proceedings: Plaintiff – C.D.S.
Moving Equipment, Inc. v. Packaging Exchange, Inc.

(b)    Violations of Statute, Regulation or Ordinance, or any order that is expected to
have a Material Adverse Effect: N/A

5.17    Reserved.

## ARTICLE 6
## AFFIRMATIVE COVENANTS

Until all Obligations are irrevocably paid and performed in full (other than contingent obligations
with respect to which no claim has been asserted or threatened) and the Loan Documents are terminated,
each Borrower shall:

6.5    **Deposit Accounts:**

| Account Holder | Bank Name | Account Type | Account Number Ending |
|---|---|---|---|
| C.D.S. Moving Equipment, Inc. | Chase Bank | Checking | 9235 |

6.13    **Certificates; Reports; Other Financial Information**.

(j)    With each Advance request and at least one time every seven-day period, furnish
to Lender a Borrowing Base Certificate executed by a Responsible Representative of the Borrowers,
together with all such related information as required by Lender in its Discretion.

6.15    Reserved.

## ARTICLE 7
## NEGATIVE COVENANTS

Until all Obligations are irrevocably paid and performed in full (other than contingent obligations
with respect to which no claim has been asserted or threatened) and the Loan Documents are terminated,
no Borrower may:

7.17    Reserved.

## ARTICLE 8
## CONDITIONS PRECEDENT AND POST-CLOSING DELIVERABLES

8.1    Conditions Precedent: Lender's extension of the initial Loan or Advances (including Loans
and Advances on the Closing Date) in its discretion is subject to the satisfaction of the following conditions
precedent on the date of each Advance or Loan is requested and made:

(a)    Representations and Warranties. Each representation and warranty made by each
Loan Party in (or in connection with any Loan Document) is true, correct, and complete with the same
effect as though made on and as of the date of the Loan or Advance (it being understood that any

v_8.2023

172390512v6

Docusign Envelope ID: 1FC4C6F7-BCCC-44E5-80B0-715947205D8C

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

representation or warranty that by its terms is made as of a specified date is required to be true and correct only as of that specified date).

(b)    <u>No Material Adverse Effect.</u>  No Material Adverse Effect, or any other development that could reasonably be expected to have a Material Adverse Effect, has occurred and is continuing.

(c)    <u>No Default</u>.  No Default or Event of Default exists or would exist after giving effect to the requested Advances or Loans (but nonetheless Lender may in its discretion continue to make Advances or Loans, and if it does so that does not (1) waive any Default or Event of Default, (2) establish a course of dealing, or (3) obligate Lender to make any other Advances or Loans).

(d)    After giving effect to the extension of the initial Loan, Borrower shall have Eligible Accounts in the total aggregate amount of $500,000.

Each Advance or Loan request is a representation and warranty by Borrowers that each condition precedent to the Advance or Loan has been met on the date the Advance or Loan is requested and received.

8.2    <u>Post-Closing Deliverables</u>.  Lender's extension of any Loan or Advance after the Closing Date shall also be subject to delivery by Borrowers of each of the following within the respective time period(s) set forth below (collectively, the "Post-Closing Deliverables"):  None.

## ARTICLE 12
## <u>MISCELLANEOUS</u>

12.25    <u>**Perfection by Possession.**</u>  Borrowers and Lender hereby agree that any security interest in this Agreement may be perfected by possession of a machine copy of the executed Agreement together with an executed copy (whether wet ink signature, an electronic signature, or a machine copy of either) of this Revolving Loan Schedule.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

[SIGNATURE PAGE TO FOLLOW]

v_8.2023

5

172390512v6

DocuSign Envelope ID: 1FC4C6F7-BCCC-44E5-80B0-715947205D8C

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

Borrower and Lender entered into this Revolving Loan Schedule on the Closing Date.

**BORROWER:**

C.D.S. Moving Equipment, Inc.,
a California corporation

By: _Michael Dennis Barwick_
Name: Dennis Barwick
Its: President

**LENDER:**

Pathward, National Association

By: _Seth Alexander_
Name: Seth Alexander
Its: VP

SIGNATURE PAGE TO REVOLVING LOAN SCHEDULE

v_8.2023

172390512v6

Docusign Envelope ID: 3978FD83-6E00-4715-83F0-E97B132C1C3E

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

# REVOLVING NOTE

**Principal Amount $7,000,000.00**                                          **Troy, Michigan**

Dated: <u>May 7, 2025</u>

     FOR VALUE RECEIVED, **C.D.S. MOVING EQUIPMENT, INC.**, a California corporation ("**Borrower**"), promises to pay to the order of **PATHWARD, NATIONAL ASSOCIATION** (together with its successors and assigns, "Lender"), ON DEMAND, at its offices located at 5480 Corporate Drive, Suite 350, Troy, Michigan 48098 or at such other place as Lender or the person that then holds this Note designates in writing, the principal amount set forth above or such lesser or greater amount as may then be due under the Credit Agreement (as defined below), plus interest, fees and expenses as hereinafter provided. All payments must be made in lawful money of the United States of America in immediately available funds. Borrower does not have any right to offset, deduction, or counterclaim from the amount due.

     This Revolving Note ("Note") is referred to in and was delivered pursuant to the Credit and Security Agreement (as amended, restated or otherwise modified from time to time, the "Credit Agreement") of even date herewith between Borrower and Lender under which Advances, repayment and further Advances may be made from time to time, pursuant to the provisions of the Credit Agreement. Reference is made to the Credit Agreement for additional terms relating to this Note and the security given for this Note. Any capitalized terms used in this Note, if not defined in this Note, will have the meanings assigned to such terms in the Credit Agreement.

     The outstanding principal balance of this Note will bear interest based upon a year of 360 days with interest being charged for each day the principal amount is outstanding including the date of actual payment. The interest rate will be a rate which is equal to one and one-quarter of one percent (1.25%) in excess of the Wall Street Journal Prime Rate (the "Effective Rate"). The term "Wall Street Journal Prime Rate" means that rate of interest reported in the Wall Street Journal as the Prime Rate, as such rate may vary from time to time. Interest on this Note will change with each change in the Wall Street Journal Prime Rate so published. If at any time Lender either abandons the use of the Wall Street Journal Prime Rate or the Wall Street Journal Prime Rate is no longer published, then Lender will establish a similar replacement rate in its sole discretion. Notwithstanding the foregoing, at no time will the Effective Rate be less than six percent (6%) per annum.

     Borrower must pay interest on the principal amount which is outstanding each month in arrears commencing on the first day of the month following the funding of the transaction, and continuing on the first day of each month thereafter until the Obligations under the Revolving Loan are fully paid. If the Credit Agreement so provides, interest will also be payable at the same rate on all other sums constituting Obligations under the Revolving Loan. Any payment due on a day that is not a Business Day shall be made on the next Business Day. Payments will be applied in the manner provided in the Credit Agreement. If Borrower at any time pays less than the amount then due, Lender may accept such payment, but the failure to pay the entire amount due is an Event of Default. Upon the occurrence of an Event of Default, Lender will be permitted to charge the Default Rate. The "Default Rate" shall mean the Effective Rate plus 5.00% per annum.

     Should Borrower make any payment by mail, the payment must be actually received by Lender before the payment is credited but payment is still subject to the terms set forth in Article 2 of the Credit Agreement. Borrower assumes all risk resulting from non-delivery or delay, in delivery of any payment no matter how the payment is delivered.

v_8.2023

172362449v2

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

Docusign Envelope ID: 3978FD83-6E00-4715-83F0-E97B132C1C3E

If Borrower elects to prepay this Note and/or terminate the Credit Agreement, Borrower may do so, but only upon payment of all the Obligations under the Loans, including the Prepayment Fee set forth in the Agreement.

It is the intent of the parties that the rate of interest and other charges to Borrower under this Note shall be lawful; therefore, if for any reason the interest or other charges payable hereunder are found by a court of competent jurisdiction, in a final determination, to exceed the limit Lender may lawfully charge Borrower, then the obligation to pay interest or other charges shall automatically be reduced to such limit and, if any amount in excess of such limit shall have been paid, then such amount shall be credited to the outstanding principal balance of this Note, or if no such amount is outstanding, refunded to Borrower.

Borrower waives any obligation of Lender to present this Note for payment or to give any notice of nonpayment or notice of protest and any other notices of any kind. The liability of the Borrower is absolute and unconditional, without regard to the liability of any other party.

If this Note is signed by two or more parties, the term "Borrower" means each Borrower individually as well as all of the Borrowers together. Each Borrower shall be jointly and severally liable for all amounts due and payable under this Note and for all obligations under the Credit Agreement, as further described in the Credit Agreement.

Borrower agrees that its Electronic Signature affixed to this Note, any of the other Loan Documents, and to any amendment, supplement or other modification to such Loan Documents, or any other document or instrument delivered by Borrower in connection with the Loan Documents or any of the transactions contemplated thereby is intended to authenticate such writing and shall have the same force and effect as if it had been manually signed and physically delivered by such party. Upon request, Borrower agrees to provide a manually executed counterpart of any Loan Document, including, without limitation, this Note, or other applicable document related to the Loan Documents previously executed by Electronic Signature.

In the event it is determined that this Note is governed by Article 3 of the Uniform Commercial Code, Borrower acknowledges and agrees that this Note is an effective, enforceable and valid Transferable Record. A "Transferable Record" means an electronic record that (i) would be a note under Article 3 of the Uniform Commercial Code if the electronic record were in writing, and (ii) Borrower, as the issuer, has agreed is a transferable record.

**BORROWER:**

**C.D.S. MOVING EQUIPMENT, INC.,**
a California corporation

By: _Michael Dennis Barwick_
Name:  Dennis Barwick
Its:      President

v_8.2023

2

172362449v2

# EXHIBIT 2

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**PATHWARD NATIONAL ASSOCIATION,**
a national banking corporation,

      Plaintiff,

v.

**C.D.S. MOVING EQUIPMENT, INC.**, a California corporation.

      Defendant.

Case No.

Hon.

Mag.

---

## VERIFIED COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF, AND APPOINTMENT OF RECEIVER

Pathward National Association, a national banking corporation ("Pathward"), through its attorneys, Taft Stettinius & Hollister LLP, states as follows for its Verified Complaint for Damages, Declaratory and Injunctive Relief, and Appointment of Receiver (the "Complaint") (**Exhibit 1**, Declaration) against Defendant C.D.S. Moving Equipment, Inc., a California corporation ("CDS"):

### INTRODUCTION

1.     This action arises from CDS's defaults under a Credit and Security Agreement dated May 7, 2025 (the "Credit Agreement"), a Revolving Loan Schedule dated May 7, 2025 (the "Revolving Loan Schedule"), and a Revolving

Note in the principal amount of $7,000,000.00 dated May 7, 2025 (the "Revolving Note") (collectively, the "Loan Documents"), all in favor of Pathward. **Exhibit 2**, Credit Agreement, Revolving Loan Schedule, and Revolving Note.

2.      Under Article 2.1(a) of the Credit Agreement and the Revolving Loan Schedule, Pathward agreed, in its discretion, to make Advances to CDS "in an aggregate amount not to exceed at any one time outstanding the Maximum Borrowing Amount."[1]

3.      Under Article 4.1 of the Credit Agreement, CDS granted Pathward a continuing Lien and security interest in substantially all of CDS's personal property, which constitutes Collateral, which is defined as:

> [A]ll of the personal property in which any Borrower has any interest, whether now existing or hereafter acquired, wherever located, including all:    (a) Accounts, (b) Inventory, (c) Equipment, (d) furniture and Fixtures, (e) General Intangibles, Payment Intangibles, and Intellectual Property, (f) Investment Property, (g) Deposit Accounts and monies credited by or due from any financial institution or other depository, (h) Chattel Paper, Instruments, and Documents, (i) Goods, (j) Commercial Tort Claims, (k) Letter-of-Credit Rights, (l) Contract Rights, (m) Books and records, computer software, computer programs, and supporting obligations relating to any of the foregoing, and (n) Proceeds of any of the foregoing in whatever form (collectively the "Collateral").

---

[1] Capitalized terms not otherwise defined herein are defined in the Loan Documents. True and correct copies of which are attached as **Exhibit 2.**

2

4.      Under Article 4.6(a) of the Credit Agreement, CDS must direct its
Account Debtors and other Debtors "to remit all payments due" to CDS to a Lockbox
Account, and, under Article 4.6(b) of the Credit Agreement, if CDS "receives any
funds from a Debtor," or other specified funds, CDS "shall hold such funds in trust
for [Pathward], shall not mix such funds received with any other funds, and shall
immediately deposit such funds in the Lockbox Account in the form received," with
Pathward having "sole ownership, possession and control over the Lockbox Account
and all deposits in the Lockbox Account," and CDS having no right to that account
or its deposits.

5.      CDS has defaulted under the Loan Documents in several ways,
including, but not limited to: (a) failing to maintain the Advance Formula under
Article 2.1(d) of the Revolving Loan Schedule; (b) failing to deposit funds it
received from Debtors in the Lockbox Account as required by Article 4.6(b) of the
Credit Agreement, and failing to reflect the collection of the funds it collected in its
borrowing requests; (c) failing to provide the required financial statements and
reports required under Articles 6.12 and 6.13 in the Credit Agreement; (d) forming
another entity (Ultrapak Packaging, Inc., a Nevada corporation ("Ultrapak")) on or
about March 31, 2025 and selling CDS's inventory to Ultrapak in order to report
false receivables to Pathward to artificially inflate CDS's reported accounts
receivable and borrowing base, thereby inducing Pathward to extend or maintain

3

Revolving Loans it would not have made if CDS's receivables and Collateral had been accurately reported; and, (e) permitting a Change in Control of CDS, which constitutes an Event of Default under Article 9.9 of the Credit Agreement (collectively, the "Existing Defaults").

6.    On September 9, 2025, Pathward sent CDS a Notice of Default stating that an Event of Default existed under the Credit Agreement because CDS failed to deposit funds it received from a debtor into the Lockbox Account as required by Article 4.6(b) of the Credit Agreement, increasing the interest rate on the Obligations to the Default Rate, and reserving Pathward's rights and remedies. **Exhibit 3**, Notice of Default.

7.    CDS has not cured the Existing Defaults or repaid its Obligations. CDS also continued to convert Pathward's Collateral by breaching its Lockbox obligations after the demand for payment. Pathward now seeks (a) judgment for all amounts due under the Credit Agreement, the Revolving Loan Schedule, and the Revolving Note; (b) enforcement of its security interest in the Collateral; (c) damages for conversion of funds CDS was obligated to hold in trust and deposit into the Lockbox Account; and, (d) appointment of a receiver over CDS and the Collateral pursuant to Article 10.1(j) of the Credit Agreement, Michigan law, and this Court's equitable powers, and injunctive relief.

4

## PARTIES, JURISDICTION, AND VENUE

8.      Pathward is a federally registered financial institution with its corporate offices in Troy, Michigan, and is therefore a citizen of Michigan for purposes of 28 U.S.C. § 1332.

9.      CDS is a California corporation with its principal place of business at 375 W. Manville Street, Compton, California 90220, and is therefore a citizen of California for purposes of 28 U.S.C. § 1332.

10.     The amount in controversy exceeds $75,000, exclusive of interest and costs, because CDS's unpaid Obligations under the Credit Agreement, the Revolving Loan Schedule, and the Revolving Note total in the millions of dollars.

11.     As such, this Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because the parties are citizens of different states and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

12.     Article 12.1 of the Credit Agreement provides that the Credit Agreement, in addition to the Revolving Loan Schedule and the Revolving Note, are governed by Michigan law and that any action to enforce CDS's obligations to Pathward shall be prosecuted either in the Circuit Court of Oakland County, Michigan or the United States District Court for the Eastern District of Michigan, unless Pathward elects some other jurisdiction, and that CDS submits to the

5

jurisdiction of any such court selected by Pathward, and waives all rights to contest jurisdiction and venue.

13.    Venue is therefore proper in this Court under 28 U.S.C. § 1391(b) and Article 12.1 of the Credit Agreement.

## FACTS COMMON TO ALL COUNTS

### *The Credit Agreement, Revolving Loan Schedule, and Note*

14.    Article 2.1(a) of the Credit Agreement provides that, subject to the Credit Agreement and the Revolving Loan Schedule, Pathward may make Advances to CDS "in an aggregate amount not to exceed at any one time outstanding the Maximum Borrowing Amount," and that the Revolving Loans are evidenced by the Note.

15.    Article 2.1(c) of the Credit Agreement provides that "[t]he Revolving Loan Outstanding may not at any time exceed the Maximum Borrowing Amount (and if it does for any reason [CDS] shall immediately and without demand pay the excess to Pathward)."

16.    Article 2.1(d) of the Revolving Loan Schedule defines the "Advance Formula," and the Revolving Loan Schedule further sets forth the structure of the borrowing base and Maximum Borrowing Account:

(d)    "Advance Formula" means, at any time, the sum of:

(A)    ninety percent (90%) of Eligible Accounts, plus

6

(B)  the lesser of (i) fifty percent (50%) of Eligible Inventory, (ii) one hundred and twenty five percent (125%) of subpart (A) above from May 1 through October 31 of each year, and two hundred percent (200%) of subpart (A) above from November 1 through April 30 of each year, and (iii) $3,000,000.00, minus

(C)  all Reserves.

17.    The Revolving Note in the principal amount of $7,000,000.00 evidences CDS's repayment obligations, including interest at the contractual rate and a Default Rate upon Events of Default.

***Pathward's Lien and Security Interest and the Lockbox Account***

18.    Under Article 4.1 of the Credit Agreement, CDS granted Pathward a continuing Lien and security interest in the Collateral as that term was more fully defined therein.

19.    Under Articles 4.6(a) and (b) of the Credit Agreement, CDS must (a) notify all Account Debtors and other Debtors to remit payments to the Lockbox Account; (b) direct remittance addresses on account documents to the Lockbox Account; and (c) if CDS "receives any funds from a Debtor, or if [CDS] receives any proceeds of insurance, tax refunds or any and all other funds of any kind," CDS "shall hold such funds in trust for [Pathward], shall not mix such funds received with any other funds, and shall immediately deposit such funds in the Lockbox Account in the form received."

7

20.    Article 4.6(b) of the Credit Agreement further states that Pathward "will have sole ownership, possession and control over the Lockbox Account and all deposits in the Lockbox Account," and that CDS does not have "any right to the Lockbox Account or any deposits in the Lockbox Account."

***CDS Defaults and Fails to Cure Its Defaults***

21.    CDS failed to comply with Article 4.6 of the Credit Agreement by receiving funds from numerous Debtors and failing to deposit those funds into the Lockbox Account in the form received, instead retaining or diverting them and failing to hold them in trust for Pathward. CDS also failed to reflect the collection of the funds it collected in its borrowing requests.

22.    On September 9, 2025, Pathward sent CDS a Notice of Default.

23.    The Notice of Default states that "an Event of Default exists under the Credit and Security Agreement . . . due to Borrower's failure to deposit funds it received from a Debtor in the Lockbox Account as required under Section 4.6(b) of the Credit Agreement," and that, as a result, the interest rate on the Obligations is increased to the Default Rate.

24.    The Notice of Default further states that Pathward has no obligation to make any further Advances and reserves all of Pathward's rights and remedies.

25.    CDS has not cured this Event of Default.

8

26.    In addition to the default under Article 4.6 described above, Pathward has identified other defaults by CDS.

27.    CDS has failed to maintain the Advance Formula as required by Article 2.1(d) of the Revolving Loan Schedule.

28.    CDS has failed to provide the required financial statements and reports required under Articles 6.12 and 6.13 in the Credit Agreement.

29.    CDS, acting through its principal, formed a related entity called Ultrapak and transferred CDS inventory to Ultrapak while reporting a receivable from Ultrapak to Pathward, even though, on information and belief, Ultrapak did not pay CDS in good funds and the transaction was not an arm's-length sale, thereby inflating CDS's reported receivables and borrowing base and misrepresenting the nature and value of Pathward's Collateral.

30.    CDS permitted a Change in Control to occur, which constitutes an Event of Default under Article 9.9 of the Credit Agreement.

31.    These categories of defaults correspond to what Pathward has described to CDS as "Existing Defaults" under the Credit Agreement elsewhere in this Complaint.

32.    These Existing Default further support Pathward's exercise of its remedies under Article 10, including acceleration and receivership.

9

33.    CDS has not cured any of the defaults described throughout this Complaint.

## COUNT I – BREACH OF CONTRACT
## (AGAINST CDS)

34.    Pathward incorporates the preceding Paragraphs as if fully restated herein.

35.    The Credit Agreement, the Revolving Loan Schedule, and the Note are valid, binding, and enforceable contracts between Pathward and CDS.

36.    Pathward has performed all of its obligations under the Credit Agreement, the Revolving Loan Schedule, and the Note.

37.    CDS breached the Credit Agreement, the Revolving Loan Schedule, and the Note by, among other things:

    a.  Failing to maintain the Advance Formula under Article 2.1(d) of the Revolving Loan Schedule;

    b.  Failing to deposit funds it received from Debtors in the Lockbox Account as required by Article 4.6 of the Credit Agreement, and failing to reflect the collection of the funds it collected in its borrowing requests;

    c.  Failing to provide the required financial statements and reports required under Articles 6.12 and 6.13 in the Credit Agreement;

196907274v1

    d.   Misrepresenting the nature and amount of CDS's accounts receivable and borrowing base by forming or using a related entity known as Ultrapak, transferring CDS inventory to Ultrapak, and reporting a purported receivable from Ultrapak to Pathward for borrowing-base purposes even though, on information and belief, Ultrapak did not pay CDS in good funds and the transaction was not an arm's-length sale, thereby inflating reported receivables and availability and violating CDS covenants to provide accurate information about its Accounts and Collateral and to maintain compliance with the Advance Formula and borrowing-base limitations in violation of at least Articles 2.1(d) of the Revolving Note Schedule and Articles 6.12, 6.13, and 7 of the Credit Agreement; and,

    e.   Permitting a Change in Control of CDS, which constitutes an Event of Default under Article 9.9 of the Credit Agreement.

38.    These breaches constitute Defaults and/or Events of Default under the Credit Agreement, the Revolving Loan Schedule, and the Revolving Note, and entitle Pathward to accelerate all Obligations and enforce its rights and remedies, including enforcement of its security interest in the Collateral.

39.    As a direct and proximate result of CDS's breaches, Pathward has suffered damages in an amount to be proven at trial, including the unpaid principal

11

balance under the Note together with all accrued and accruing interest (including interest at the Default Rate), fees, costs, and reasonable attorneys' fees recoverable under the Credit Agreement, the Revolving Loan Schedule, and the Revolving Note.

WHEREFORE, Pathward respectfully requests judgment against CDS for all amounts due under the Credit Agreement, Revolving Loan Schedule, and Revolving Note, plus interest, fees, costs, and attorneys' fees, and such other relief as the Court deems just.

### COUNT II – ENFORCEMENT OF SECURITY INTEREST/ ARTICLE 9 REMEDIES UNDER THE UNIFORM COMMERCIAL CODE (AGAINST CDS)

40.    Pathward incorporates the preceding Paragraphs as if fully restated herein.

41.    Under Article 4.1 of the Credit Agreement, CDS granted Pathward a continuing security interest in the Collateral as that term was more fully defined therein.

42.    CDS's Defaults and Events of Default entitle Pathward to enforce its security interest under Article 10 of the Credit Agreement and Article 9 of the Uniform Commercial Code, including taking possession of the Collateral, selling it in a commercially reasonable manner, and applying the proceeds to the Obligations.

43.    Pathward is entitled to a declaratory judgment confirming the validity and enforceability of its security interest and authorizing it to exercise all Article 9

12

remedies, and to a deficiency judgment for any unpaid balance remaining after application of Collateral proceeds.

WHEREFORE, Pathward respectfully requests a declaratory judgment enforcing its security interest in the Collateral and authorizing Article 9 remedies, and judgment for any deficiency, plus costs and attorneys' fees, and such other relief as the Court deems just.

## COUNT III – COMMON LAW AND STATUTORY CONVERSION (AGAINST CDS)

44.    Pathward incorporates the preceding Paragraphs as if fully restated herein.

45.    Under Article 4.6 of the Credit Agreement, CDS must hold in trust for Pathward all funds it receives from Debtors and specified other funds and immediately deposit those funds into the Lockbox Account in the form received, with Pathward having sole ownership, possession, and control over that account and all deposits.

46.    CDS has received funds from one or more Debtors and other sources covered by Article 4.6 but did not hold those funds in trust or deposit them into the Lockbox Account as required and failed to reflect the collection of the funds it collected in its borrowing requests, instead retaining or diverting them for its own purposes.

13

47.    CDS also caused inventory to be transferred to Ultrapak, treated Ultrapak as an account debtor, and reported a receivable from Ultrapak to Pathward to increase availability, while failing to ensure that CDS received actual payment in good funds. To the extent CDS received payments relating to the Ultrapak "receivable," CDS did not hold such funds in trust for Pathward or deposit them into the Lockbox Account as required by Article 4.6, but instead retained or used them, or allowed inventory to be removed without payment at all, thereby converting Collateral and proceeds.

48.    By doing so, CDS wrongfully exercised dominion and control over specific, identifiable funds to which Pathward had a superior right of possession and which were to be held in trust for Pathward.

49.    CDS's conduct constitutes conversion under Michigan common law and statutory conversion under MCL 600.2919a, entitling Pathward to its actual damages and, where authorized, statutory treble damages and reasonable attorneys' fees.

WHEREFORE, Pathward respectfully requests judgment against CDS for conversion and statutory conversion, in an amount to be proven at trial, including statutory treble damages and attorneys' fees, plus costs and such other relief as the Court deems just.

14

## COUNT IV – FRAUD
## (AGAINST CDS)

50.    Pathward incorporates the preceding Paragraphs as if fully restated herein.

51.    CDS, acting through its principal, intentionally misrepresented material facts to Pathward regarding CDS's accounts receivable and borrowing base.

52.    In particular, CDS formed or used a related entity known as Ultrapak and transferred CDS inventory to Ultrapak while reporting a receivable from Ultrapak to Pathward as if Ultrapak were a bona fide, independent account debtor and the Ultrapak receivable were a genuine, collectible account.

53.    On information and belief, CDS knew that Ultrapak did not pay CDS in good funds commensurate with the reported receivable, that the Ultrapak transaction was not an arm's-length sale to a truly independent third party, and that the Ultrapak "receivable" did not represent a real, collectible obligation.

54.    CDS nevertheless submitted borrowing-base information to Pathward that included the purported Ultrapak receivable for purposes of calculating the Advance Formula and availability under the Credit Agreement, failing to reflect the collection of the funds it collected from Debtors in its borrowing requests, intending that Pathward rely on this information in determining whether, and in what amount, to make additional Revolving Loans.

196907274v1

55.    CDS further knew, or recklessly disregarded, that Pathward's lending decisions and collateral monitoring depended on the accuracy of CDS's reported Accounts and borrowing base, including the identity and creditworthiness of CDS's account debtors.

56.    Pathward reasonably relied on CDS's representations concerning its receivables and borrowing base, including the existence and amount of the Ultrapak receivable, in extending and continuing Revolving Loans to CDS.

57.    CDS's misrepresentations and omissions regarding Ultrapak were material, were made with knowledge of their falsity or with reckless disregard for the truth, and were intended to induce Pathward to continue to extend credit and to treat the Ultrapak "receivable" as valid Collateral.

58.    CDS's misrepresentations and omissions regarding Ultrapak were material, were made with knowledge of their falsity or with reckless disregard for the truth, and were intended to induce Pathward to continue to extend credit and to treat the Ultrapak "receivable" as valid Collateral.

WHEREFORE, Pathward respectfully requests judgment against CDS in an amount to be proven at trial, including compensatory damages, exemplary damages where permitted, and reasonable attorneys' fees and costs, together with such other relief as the Court deems just.

16

## COUNT IV – APPOINTMENT OF RECEIVER
## AND INJUNCTIVE RELIEF
## (AGAINST CDS)

59.    Pathward incorporates the preceding Paragraphs as if fully restated herein.

60.    Pathward seeks appointment of a receiver under Article 10.1(j) of the Credit Agreement, Mich. Comp. Laws § 600.2926, and this Court's equitable authority as recognized in Fed. R. Civ. P. 66.

61.    Article 10 of the Credit Agreement sets forth Pathward's remedies when an Event of Default exists.

62.    Article 10.1(j) of the Credit Agreement provides that, when an Event of Default exists, Pathward may "[a]ppoint a receiver for all or any part of the Collateral," and that CDS "consents to the appointment of a receiver without notice or bond, to the fullest extent not prohibited by applicable law, and waives all notices of and defenses to the appointment of a receiver and may not oppose any application [Pathward] makes for the appointment of a receiver."

63.    Multiple uncured Events of Default by CDS exist, including:

    a. Failing to maintain the Advance Formula under Article 2.1(d) of the Revolving Loan Schedule;

    b. Failing to deposit funds it received from Debtors in the Lockbox Account as required by Article 4.6 of the Credit Agreement;

17

    c. Failing to provide the required financial statements and reports required under Articles 6.12 and 6.13 in the Credit Agreement;

    d. CDS's Ultrapak scheme, in which CDS transferred inventory to a related entity without genuine payment and reported a sham Ultrapak receivable to Pathward to inflate the borrowing base; and,

    e. Permitting a Change in Control of CDS, which constitutes an Event of Default under Article 9.9 of the Credit Agreement.

64.    The Collateral consists largely of CDS's operating assets, including inventory and accounts receivable, which are easily dissipated or diverted.

65.    CDS's willingness to divert inventory to Ultrapak, misstate receivables, and retain or misuse Lockbox-eligible collections shows that, absent a receiver, Pathward cannot rely on CDS to protect the Collateral, to apply proceeds to the Obligations, or to provide accurate, timely information concerning its business.

66.    Without appointment of a receiver, Pathward lacks an effective mechanism to stop further Ultrapak-type transfers, prevent continued diversion of funds that should be held in trust and deposited into the Lockbox Account, or ensure that the Collateral is preserved and liquidated in an orderly and commercially reasonable manner.

67.    Appointment of a neutral receiver will allow the Collateral to be gathered, reconciled, and administered under Court supervision.

68.    Michigan law authorizes courts to appoint receivers in appropriate circumstances, including under Mich. Comp. Laws § 600.2926, and federal courts in this District have exercised their equitable powers to appoint receivers in commercial lending cases where the loan documents expressly authorize receivership and the lender's collateral is at risk of waste or diversion.

69.    Pathward is also likely to succeed on the merits because the material facts of CDS's default are not reasonably disputable from the loan documents and Pathward's written notices.

70.    Pathward also faces irreparable harm absent a receiver because once receivables and inventory are diverted, including through entities such as Ultrapak, the loss cannot be fully remedied.

71.    CDS will not be unfairly prejudiced because it expressly consented in Article 10.1(j) to the appointment of a receiver and waived defenses.

72.    Finally, the public interest favors enforcing commercial loan agreements and preserving collateral.

WHEREFORE, Pathward respectfully requests that this Court: (a) Appoint a receiver over CDS and the Collateral with authority to take possession of, manage, operate or wind down CDS's business, unwind sham transactions such as the Ultrapak transfers, collect receivables and other proceeds, and preserve and liquidate Collateral under Court supervision; (b) Enjoin CDS and all persons acting with or

19

through it from interfering with the receiver or transferring, encumbering, or disposing of any Collateral (including inventory transferred or to be transferred to Ultrapak or similar entities) except as authorized by the receiver or this Court; (c) Direct CDS to turn over to the receiver all books, records, systems, passwords, keys, and other information necessary for the receiver to perform its duties; and, (d) Grant such other and further equitable relief as the Court deems just.

## PRAYER FOR RELIEF

WHEREFORE, Pathward respectfully requests that this Court:

A.    Enter judgment in favor of Pathward and against CDS for all amounts due and owing under the Credit Agreement, the Revolving Loan Schedule, and the Revolving Note, including unpaid principal, accrued and accruing interest (including at the Default Rate), fees, costs, and reasonable attorneys' fees;

B.    Declare that Pathward holds a valid, enforceable, and perfected security interest in the Collateral and authorize Pathward to exercise all Article 9 remedies, including foreclosure and sale of the Collateral, and to recover any deficiency;

C.    Award damages for conversion (common law and statutory), including statutory treble damages and attorneys' fees;

D.    Appoint a receiver and grant injunctive relief as set forth above;

E.    Award pre- and post-judgment interest and costs; and,

F.    Grant such other and further relief as the Court deems just.

20

196907274v1

Respectfully submitted,

TAFT STETTINIUS & HOLLISTER, LLP

Dated:  December 23, 2025          By:    /s/ Vincent C. Sallan
                                  Ethan R. Holtz (P71884)
                                  Vincent C. Sallan (P79888)
                                  *Attorneys for Plaintiff*
                                  27777 Franklin Road, Suite 2500
                                  Southfield, MI 48034
                                  (248) 351-3000
                                  eholtz@taftlaw.com
                                  vsallan@taftlaw.com

196907274v1

# EXHIBIT 3

Label Matrix for local noticing
0973-2
Case 2:25-bk-21646-WB
Central District of California
Los Angeles
Mon Jan  5 08:18:43 PST 2026

C.D.S. Moving Equipment, Inc.
375 W Manville St
Compton, CA 90220-5617

Los Angeles Division
255 East Temple Street,
Los Angeles, CA 90012-3332

303 Networks, Inc.
Attn: Corporate Officer
14766 N. Maywood Ct.
Brighton, CO 80603-8891

AAA Oil Inc.
dba California Fuels and Lubricants
Attn: Corporate Officer
11621 Westminster Ave.
Garden Grove, CA 92843-3917

AT&T COMPTON
Attn: Corporate Officer
PO Box 5019
Carol Stream, 60197-5019

AT&T Chicago
Attn: Corporate Officer
PO Box 5019
Carol Stream, IL 60197-5019

AT&T Mobility
Attn: Corporate Officer
PO Box 6463
Carol Stream, IL 60197-6463

AT&T TDI
Attn: Corporate Officer
PO Box 5019
Carol Stream, IL 60197-5019

Affordable Box Co.
Attn: Corporate Officer
865 Highway 33 Ste 3
Freehold, NJ 07728-8475

Air Compressor
dba Kimberly P. Parker
Attn: Corporate Officer
34428 Yucaipa Blvd Ste. # 242
Yucaipa, CA 92399-2474

Amcon Foam
Attn; Corporate Officer
1510 Nelson Rd Unit A
Longmont, CO 80501-6339

American Propane Inc.
Attn: Corporate Officer
PO Box 44862
Los Angeles, CA 90044-0862

Ancra International LLC
Attn: Corporate Officer
25591 Network Pl
Chicago, IL 60673-1255

Arentfox Schiff LLP
Attn: Corporate Officer
233 South Wacker Drive Suite 7100
Chicago, IL 60606-6446

Assurehire, Inc.
Attn: Corporate Officer
2206 Plaza Dr Ste 4100
Rocklin, CA 95765-4417

Atlantic Paper Company
Attn: Corporate Officer
PO Box 160
Lancaster, TX 75146-0160

Atlas Sales & Marketing
Attn: Corporate Officer
Po Box 565
Niwot, CO 80544-0565

Avalara, Inc.
Attn: Corporate Officer
Dept Ch 16781
Palatine, IL 60055-0001

B&P Manufacturing Inc.
Attn: Corporate Officer
8051 E 34 Rd
Cadillac, MI 49601-9013

BSB Leasing, inc.
6 Inverness Ct E Ste 125
Englewood, CO 80112-5512

Bank of the West
201 N Civic Dr Ste 360B
Walnut Creek, CA 94596-3896

Betts Trucks Parts & Service
Attn: Corporate Officer
PO Box 102165
Pasadena, CA 91189-2165

Blue Beacon International, Inc.
Attn: Corporate Officer
PO Box 856
Salina, KS 67402-0856

Bocks Board Packaging of Texas Inc.
Attn: Corporate Officer
1520 E Wintergreen Rd
Hutchins, TX 75141-4228

Box Partners, LLC
Attn: Corporate Officer
2650 Galvin Drive
Elgin, IL 60124-7893

Boyer-Rosene Mov & Strg Inc.
Attn: Corporate Officer
2638 S Clearbrook Dr
Arlington Heights, IL 60005-4626

C T Corporation System, As Rep.
Attn: SPRS
330 N Brand Blvd Suite 700
Glendale, CA 91203-2336

CMSA
Attn: Corporate Officer
10900 E. 183rd Street # 300
Cerritos, CA 90703-5370

Califoam Products, Inc.
Attn: Corporate Officer
10775 Silicon Ave
Montclair, CA 91763-6022

California Water Service Co.
Attn: Corporate Officer
PO Box 940001
San Jose, CA 95194-0001

Caltex Plastics
Attn: Corporate Officer
PO Box 58546
Vernon, CA 90058-0546

(p)CENTERPOINT ENERGY
PO BOX 1700
HOUSTON TX 77251-1700

Chateau Products, LLC
Attn: Corporate Officer
1820 47th Ter E
Bradenton, FL 34203-3773

Citistaff Solutions, INC
Attn: Corporate Officer
PO Box 845510
Los Angeles, CA 90084-5510

City of North Las Vegas Utilities
Attn: Corporate Officer
PO Box 360118
North Las Vegas, NV 89036-0118

Clark Foam Products Corp.
Attn: Corporate Officer
655 Remington Blvd
Bolingbrook, IL 60440-4822

Colson Group USA
Attn: Corporate Officer
4451 Eucalyptus Ave #340
Chino, CA 91710-9702

Colson Group USA
Attn: Corporate Officer
91346 Collection Center Drive
Chicago, IL 60693-0001

Comed - Chicago
Attn: Corporate Officer
PO Box 6111
Carol Stream, IL 60197-6111

Computer Ease Rental
Attn: Corporate Officer
PO Box 128
Dousman, WI 53118-0128

Comref So CA Industrial Sub G
Attn: Corporate Officer
62605 Collections Drive
Chicago, IL 60693-0626

Comref So CA Industrial Sub G (Compton R
Attn: Corporate Officer
62605 Collections Drive
Chicago, IL 60693-0626

Constellation New Energy, Inc
Attn: Corporate Officer
PO Box 5471
Carol Stream, 60197-5471

Continental Western Corp.
Attn: Corporate Officer
PO Box 2418
San Leandro, CA 94577-0241

Core Personnel Staffing Svs, LLC
Attn: Corporate Officer
10635 Control Pl.
Dallas, TX 75238-1334

Corodata Shredding, Inc,
Attn: Corporate Officer
PO Box 846137
Los Angeles, CA 90084-6137

Corporation Service Company
801 Adlai Stevenson Drive
Springfield, IL 62703-4261

Coyote Logistics, Inc.
Attn: Corporate Officer
960 North Point Pkwy Ste 150
Alpharetta, GA 30005-4123

Cps Energy
Attn: Corporate Officer
PO Box 2678
San Antonio, TX 78289-0001

Crown Lift Trucks
Crown Equipment Corp
Attn: Corporate Officer
PO Box 641173
Cincinnati, OH 45264-1173

Cummins & White, LLP
Attn: Corporate Officer
2124 Se Bristol St Ste 300
Newport Beach, CA 92660-0764

Custom Label & Decal, LLC
Attn: Corporate Officer
7800 Paterson Pass Road
Livermore, CA 94550-9544

Cybersource Corporation
Attn: Corporate Officer
PO Box 742842
Los Angeles, CA 90074-2842

DMV
Attn: Corporate Officer
PO Box 942897
Sacramento, CA 94297-0897

DRA G&I Fund IX Industrial LLC
Attn: Corporate Officer
PO Box 206812
Dallas, TX 75320-6812

DUTRO COMPANY
Attn: Corporate Officer
675 N 600 W Ste 2
Logan, UT 84321-3197

DXV - Pull Notice
Attn: Corporate Officer
PO Box 825339
Sacramento, CA 94232-5339

Dana Mackie
Attn: Corporate Officer
16 Sanderling Lane
Aliso Vielo, CA 92656-1220

Deline Box Co
Attn: Corporate Officer
3700 Lima St
Denver, CO 80239-3309

Denver Pallets Inc
Attn: Corporate Officer
11500 Wright Road
Lynwood, CA 90262-3944

Dext Capital LLC
Attn: Corporate Officer
PO Box 74007351
Chicago, IL 60674-7351

E Z Hauler Products LLC
Attn: Corporate Officer
26231 Crown Ranch Blvd.
Montgomery, TX 77316-2105

EOSlift Usa Corporation
Attn: Corporate Officer
1590 S Milliken Ave Ste H
Ontario, CA 91761-2326

Elkay Plastics Co - Denver
Attn: Corporate Officer
14600 E 35th Place, Unit
Aurora, CO 80011-1267

Elkay Plastics Co - Denver
Attn: Corporate Officer
PO Box 51103
Los Angeles, CA 90051-5403

Elkay Plastics Co. Inc
Attn: Corporate Officer
PO Box 51103
Los Angeles, CA 90051-5403

Empire Container Corporation
Attn: Corporate Officer
1161 E Walnut St
Carson, CA 90746-1382

Empire Staple Co.
Attn: Corporate Officer
200 E. 55th Ave, Suite 100
Denver, CO 80216-1772

Employer Solutions Staffing Group.
Attn: Corporate Officer
7201 Metro Blvd
Edina, MN 55439-1323

Escalera Inc
Attn: Corporate Officer
PO Box 1359
Yuba City, CA 95992-1359

Express Toll
Attn: Corporate Officer
E-470 Public Highway Authority
Aurora, CO 80018

F.J. Smith Sales Co., Inc.
Attn: Corporate Officer
6815 E Washington Blvd
Los Angeles, CA 90040-1927

FMH Material Handling Solutions
Attn: Corporate Officer
PO Box 5052
Denver, CO 80217-5052

Fedex Compton
Attn: Corporate Officer
PO Box 7221
Pasadena, CA 91109-7321

Ferrell Gas, L.P.
Attn: Corporate Officer
PO Box 173940
Denver, CO 80217-3940

Financial Federal Credit Inc.
7 Corporate Park Ste 240
Irvine, CA 92606-5157

First Choice (Sacramento)
Attn: Corporate Officer
4680 Pell Dr Ste A
Sacramento, CA 95838-2082

Fleenor Company Inc Do Not Use
Attn: Corporate Officer
Dept #33927
PO Box 39000
San Francisco, CA 94139-0001

Fleenor Paper Company
Attn: Corporate Officer
Dept. # 133927
San Francisco, CA 94139-0001

For2fi, Inc.
Attn: Corporate Officer
PO Box 79428
North Dartmouth, MA 02747-0986

Frank W. Winnie Inc
Attn: Corporate Officer
521 Fellowship Rd Ste 115
Mount Laurel, NJ 08054-3413

Frontier
Attn: Corporate Officer
PO Box 740407
Cincinnatir OH 45274-0407

GDR Group Inc
Attn: Corporate Officer
3 Park Plaza Suite 1700
Irvine, CA 92614-8540

General Work Products D.B.A. Of GWP Bish
Attn: Corporate Officer
14401 Industry Cir
La Mirada, CA 90638-5812

General Work Products D.B.A. Of GWP Bish
Attn: Corporate Officer
2301 Commerce Street Ste 110
Houston, TX 77002-2424

Global Venture
Attn: Corporate Officer
7112 S. 262nd Street
Kent, WA 98032

Grainger
Attn: Corporate Officer
Dept 816404016
Palatine, IL 60038-0001

Graphics 2 Press
Attn: Corporate Officer
3321-A Dalworth St
Arlington, TX 76011-6867

Groot Industries, Inc.
Attn: Corporate Officer
PO Box 742695
Cincinnati, OH 45274-2695

HBM Supply Denver
Attn: Corporate Officer
4801 East 39th St
Denver, CO 80207-1009

HBM Supply San Diego
Attn: Corporate Officer
San Diego, CA 92126-6312

Hartford Insurance
Attn: Corporate Officer
Hartford, CT 06104-2907

Hayward M Industrial LLC
Attn: Corporate Officer
Hicksville, NY 11802-6149

Home Depot Credit Serv Corp
Attn: Corporate Officer
PO Box 9001030
Louisvillee KY 40290-1030

Inland Lease & Rental Inc.
Attn: Corporate Officer
1600 Washington Blvd
Montebello, CA 90640-5422

Intercon Paper
Attn: Corporate Officer
4545 Leston St
Dallas, TX 75247-5709

International Paper - Bell
Attn: Corporate Officer
PO Box 31001-0780
Pasadena, CA 91110-0780

International Paper - Carson
Attn: Corporate Officer
PO Box 31001-0780
Pasadena, CA 91110-0780

International Paper - Chicago
Attn: Corporate Officer
PO Box 31001-0780
Pasadena, CA 91110-0780

International Paper - Exeter
Attn: Corporate Officer
PO Box 31001-0780
Pasadena, CA 91110-0780

International Paper Denver
Attn: Corporate Officer
PO Box 676765
Dallas, TX 75267-6765

J.B. Hunt Transport, Inc.
Attn: Corporate Officer
615 J.B. Hunt Corporate Drive
Lowell, AR 72745-9143

JL Freight Line LLC
1187 N Willow Ave Ste 103 #34
Clovis, CA 93611-4411

JP Morgan Chase Bank, NA
1111 Polaris Pkwy, Suite 4N
Columbus, OH 43240-2050

JPMorgan Chase Bank, N.A.
10 S. Dearborn, Floor L2, IL 1-1145
Chicago, IL 60603-2300

Jesse White Secretary Of State
Attn: Corporate Officer
501 S. 2nd Street
Springfiled, IL 62756-5510

Jl Freight Line, Llc
Attn: Corporate Officer
1187 N Willow Ave
Clovis, CA 93611-4411

Jm Equipment Co., Inc.
Attn: Corporate Officer
PO Box 396065
San Francisco, CA 94139-6065

Key Container Company Inc.
Attn: Corporate Officer
4224 Santa Ana St
South Gate, CA 90280-2557

Komar Alliance, LLC
dba Papercutters
Attn: Corporate Officer
PO Box 844437
Los Angeles, CA 90084-4437

Komatsu Forklift Usa, Llc
Attn: Corporate Officer
15868 Collections Center Dr.
Chicago, IL 60693-0001

Konica Minolta 2000183630
Attn: Corporate Officer
PO Box 100706
Pasadena, CA 91189-0706

Konica Minolta Business Solutions
U.S.A. Inc.
PO Box 728
Park Ridge, NJ 07656

Kpack
Attn: Corporate Officer
2122 W Flotilla St
Montebello, CA 90640-4961

Lakehead Newsprint Ltd D.B.A. Of James
Attn: Corporate Officer
100 Main St Ste 101
Thunder Bay, ON P7B 6R9

Laminated Industries Inc
Attn: Corporate Officer
2000 Brunswich Ave
Linden, NJ 07036-2400

Lien Solutions
PO Box 29071
Glendale, CA 91209-9071

Lolita V. Leblanc
1696 Wagner Street
Pasadena, CA 91106-1328

Lumber Ci:y Corp.
dba Neiman Reed Lumber
Attn: Corporate Officer
PO Box 849803
Los Angeles, CA 90084-9803

Luttrell Engraving Inc.
Attn: Corporate Officer
5000 W 128th Pl
Alsip, IL 60803-3230

Manufacturers Warehouse
Attn: Corporate Officer
11475 E. 53rd Ave Unit 160
Denver, CO 80239-2336

Maximum Fastners Inc.
Attn: Corporate Officer
14107 Dinard Ave
Sante Fe Springs, CA 90670-4936

Mckinley Packaging La Company
Attn: Corporate Officer
PO Box 744534
Atlanta, GA 30374-4534

Mechanical Plastics Corp
Attn: Corporate Officer
110 Richards Ave
Norwalk, CT 06854-1685

Melcher Manufacturing Co. Inc
Attn: Corporate Officer
PO Box 11857
Spokane, WA 99211-1857

Milburn Printing
Attn: Corporate Officer
120-A Wilbur Place
Bohemia, NY 11716-2440

Mountain States Plastics, Inc
Attn: Corporate Officer
3 Industrial Park
Johnstown, CO 80534-7802

NV Energy
Attn: Corporate Officer
PO Box 30086
Reno, NV 89520-3086

Neil's Stationery Inc.
Attn: Corporate Officer
PO Box 8878
Fountain Valley, CA 92728-8878

New Mexico Gas Company
Attn: Corporate Officer
PO Box 27885
Albuquerque, NM 87125-7885

(p)NISSAN MOTOR ACCEPTANCE CORPORATION
LOSS RECOVERY
PO BOX 660366
DALLAS TX 75266-0366

North Park Transportation Co
Attn: Corporate Officer
5150 Columbine St
Denver, CO 80216-2305

Nrg Maintenance Co.
Attn: Corporate Officer
PO Box 231
Bellflower, CA 90707-0231

ODP Business Solutions LLC
Office Depot
Attn: Corporate Officer
P7 Box 633204
Cincinnati, OH 45263-3204

Oracle America, Inc
Attn: Corporate Officer
2300 Oracle Way
Austin, TX 78741-1400

Orion Plastics Corporation
Attn: Corporate Officer
Pasadena, CA 91189-0005

PBE, LLC
Attn: Corporate Officer
4320 Eastpark Dr
Houston, TX 77028-5920

PG&E /Sacramento
Attn: Corporate Officer
PO Box 997300
Sacramento, CA 95899-7300

PNM Electric
Attn: Corporate Officer
PO Box 27900
Albuquerque, NM 87125-7900

Pacific Cargo Control, Inc.
Attn: Corporate Officer
Tualatin, OR 97062-8881

Pacific Coast Bach Label Co.
Attn: Corporate Officer
Los Angeles, CA 90007-3814

Pacific Equipment Solutions
Attn: Corporate Officer
PO Box 7685
Fremont, CA 94537-7685

Packaging Corporation Of
America Denver
Attn: Corporate Officer
36596 Treasury Center
Chicago, IL 60694-6500

Packaging Corporation of America
Attn: Corporate Officer
19570 E. San Jose Ave.
City Of Industry, CA 91748-1404

Pallet Direct, Inc.
Attn: Corporate Officer
PO Box 11059
Naples, FL 34101-1059

Paramount Saw LLC
Attn: Corporate Officer
16493 Paramount Blvd.
Paramount, CA 90723-5427

Parkhouse Tire, Inc
Att: Corporate Officer
PO Box 2430
Bell Gardens, CA 90202-2430

Parr Lumber
Attn: Corporate Officer
Po Box 989
Chino, CA 91708-0989

Partners Personnel Management
Services, LLC
Attn: Corporate Officer
10065 E. Harvard Ave.
Denver, CO 80231-5968

Partners Personnel Management
Services, LLC
Attn: Corporate Officer
3820 State St Ste B
Santa Barbara, CA 93105-3182

Penn Elcom Inc.
Attn; Corporate Officer
7465 Lampson Ave,
Garden Grove, CA 92841-2903

Penske Albuquerque
Attn: Corporate Officer
PO Box 7429
Pasadena, CA 91109-7429


Penske Chicago
Attn: Corporate Officer
PO Box 802577
Chicago, IL 60680-2577

Penske Compton
Attn: Corporate Officer
PO Box 7429
Pasadena, CA 91109-7429

Penske Hayward
Attn: Corporate Officer
PO Box 7429
Pasadena, CA 91109-7429


Penske Sacramento
Attn: Corporate Officer
PO Box 7429
Pasadena, CA 91109-7429

Penske San Antonio
Attn: Corporate Officer
PO Box 802577
Chicagor IL 60680-2577

Penske Vegas
Attn: Corporate Officer
PO Box 7429
Pasadena, CA 91109-7429


Performance Heating & Air Inc.
Attn: Corporate Officer
602 Sidwell Ct Ste R
Saint Charles, IL 60174-3422

Pestgon, Inc.
Attn: Corporate Officer
3612 Ocean Ranch Blvd
Oceanside, CA 92056-2669

Petro Distributors, Inc.
Attn: Corporate Officer
21515 Hawthorne Blvd. Suite 200
Torrance, CA 90503-6512


Pioneer Packing Inc.
Attn: Corporate Officer
2430 S Grand Ave
Santa Ana, CA 92705-5211

Pitney Bowes Chicago & Vegas
Attn: Corporate Officer
PO Box 371887
Pittsburgh, PA 15250-7887

Poly-Corr Industries Inc.
Attn: Corporate Officer
13801 Magnolia Ave
Chino, CA 91710-7028


PolyChem 6138800
Attn: Corporate Officer
Po Box 901716
Cleveland, OH 44190-1716

Polyair Packaging Inc.
Attn: Corporate Officer
c/o 4604 Payshere Circle
Chicago, IL 60674-4604

Prairie View Industries, Inc.
Attn: Corporate Officer
Fairbury, NE 68352-1355


Pratt Industries Inc.
Attn: Corporate Officer
PO Box 933949
Atlanta, GA 31193-3949

Pregis Corp.
Attn: Corporate Officer
PO Box 100812
Pasadena, CA 91189-0812

Price Transfer Inc.
Attn: Corporate Officer
2711 E Dominguez St
Long Beach, CA 90810-1352


Prime Converting
Attn: Corporate Officer
9121 Pittsburgh Ave
Rancho Cucamonga, CA 91730-5550

Prime Converting
Corporation Of Georgia
Attn: Corporate Officer
6175 Boatrock Blvd. Suite A
Altanta, GA 30336-2705

Primetac Adherex Group
Attn: Corporate Officer
223 Gates Rd Ste B
Little Ferry, NJ 07643-1900


Prodrivers
Attn: Corporate Officer
PO Box 102409
Atlanta, GA 30368-2409

Pure Water Center, Inc.
Attn: Corporate Officer
25876 The Old Rd # 312
Stevenson Ranch, CA 91381-1711

Qspac Industries Inc
Attn: Corporate Officer
15020 Marquardt Ave
Santa Fe Sprlngs, CA 90670-5704


Quench USA, Inc.
Attn: Corporate Officer
PO Box 735777
Dallas, TX 75373-5777

Quirk & Kids Logistics, LLC
dba Rhode Sense
Attn: Corporate Officer
2510 Chili Ave. Suite 3
Rochester, NY 14624-3334

Ramos Oil Company, Inc
Attn: Corporate Officer
PO Box 401
West Sacramento, CA 95691-0401

Raymond Handling Concepts Corp
Dba Raymond West
Attn: Corporate Officer
PO Box 7678
San Francisco, CA 94120-7678

Republic Services (Vegas)
Attn: Corporate Officer
Po Box 78829
Phoenix, AZ 85062-8829

Republic Services - (Sacramento)
Attn: Corporate Officer
Po Box 78829
Phoenix, AZ 85062-8829

Republic Services - Compton
Attn: Corporate Officer
PO Box 78829
Phoenix, AZ 85062-8829

Robert E. Opera
Winthrop Golubow Hollander, LLP
1301 Dove Street, Suite 500
Newport Beach, CA 92660-2467

Robert Half Inc
Attn: Corporate Officer
Po Box 743295
Los Angeles, CA 90074-3295

Rush Truck Leasing, Inc.
Attn: Corporate Officer
Po Box 34630
San Antonio, TX 78265-4630

SB&T Graphics
Attn: Corporate Officer
1574 San Juan Dr
Brea, CA 92821-1837

SC Fuels 0041598
Attn: Corporate Officer
Po Box 14014
Orange, CA 92863-1414

San Gabriel Temp Staffing Sac D.B.A. Lab
Attn: Corporate Officer
Po Box 900
Kearney, MO 64060-0900

Service Uniform
Attn: Corporate Officer
2580 S Raritan Street
Englewood, CO 80110-1125

Singer Lewak Accountants & Consult
Attn: Corporate Officer
10960 Wilshire Blvd Suite 1100
Los Angeles, CA 90024-3714

Singer Lewak Aces & Arrows
Attn: Corporate Officer
10960 Wilshire Blvd Fl 7
Los Angeles, CA 90024-3710

Singer Lewak Ryan Sidor
Attn: Corporate Officer
10960 Wilshire Blvd F17
Los Angeles, CA 90024-3702

Sio Logistics LLC
Attn: Corporate Officer
550 Reserve St. Suite 190
Southlake, TX 76092-1598

Smurfit Kappa North America Llc
Attn: Corporate Officer
Po Box 660367
Dallas, TX 75266-0367

Smurfit Kappa North America Llc - Von Or
Attn: Corporate Officer
Po Box 1359
Von Ormy, TX 78073-1359

So California Edison - Esplanade
Attn: Corporate Officer
PO Box 600
Rosemead, CA 91770-0600

Socalgas
Attn: Corporate Officer
Po Box C
Monterey Park, CA 91754-0932

Southern Counties Lubricants
Attn: Corporate Officer
Po Box 5765
Oranger CA 92863-5765

Southern Nevada A/C & Heating
Attn: Corporate Officer
3925 W Hacienda Ave Ste 106
Las Vegas, NV 89118-1788

Spectrum Business
Attn: Corporate Officer
Po Box 60074
City Of Industry, CA 91716-0074

Sps Commerce
Attn: Corporate Officer
333 S. 7th Street, Ste 1000
Minneapolis, MN 55402-2421

Staples Advantage #La 10004198
Attn: Corporate Officer
Po Box 105638
Atlanta, GA 30348-5638

(p)STAPLES BUSINESS ADVANTAGE THOMAS RIGGLEMA
7 TECHNOLOGY CIRCLE
COLUMBIA SC 29203-9591

Sterling Manuf & Distributing
Attn: Corporate Officer
150 Bennington
Houston, TX 77022-4863

Stevens Appliance Truck
Attn: Corporate Officer
Po Box 897
Augusta, GA 30903-0897

Storopak Inc.
Attn: Corporate Officer
Location 00207 Dept. C
Cincinnati, OH 15264-0207

Sunset Ladder Co
Attn: Corporate Officer
2526 Rosemead Blvd
South El Monte, CA 91733-1567

Surestaff, LLC
Attn: Corporate Officer
7083 Solution Center
Chicago, IL 60677-7000

Surface Shields, Inc.
Attn: Corporate Officer
27664 Network Pl
Chicago, IL 60673-1276

TNT Wholesalers Inc
Attn: Corporate Officer
2901 W. Coast Hwy 4200
Newport Beach, CA 92663-4023

TRM Manufacturing, Inc.
Attn: Corporate Officer
Po Box 77520
Corona, CA 92877-0117

Terex Usa, LLC
Attn: Corporate Officer
12506 Collections Center Drive
Chicago, IL 60693-0001

The C.H. Hanson Company
Attn: Corporate Officer
2000 N Aurora Rd
Naperville, IL 60563-8793

Thomas Petroleum, LLC Pilot Thomas Logis
Attn; Corporate Officer
Po Box 677289
Dallas, TX 75267-7289

Toyota Motor Credit Corp
PO Box 3457
Torrance, CA 90510-3457

Trade Of Amta, Inc. Dba Boxer Tools
Attn: Corporate Officer
9643 Santa Fe Springs Rd
Santa Fe Springs, CA 90670-2917

Tree House
Attn: Corporate Officer
2341 Pomona Rd Ste 108
Corona, CA 92878-4373

Triad Product Finishing Inc
Attn: Corporate Officer
1440 S Hwy 121 Ste 13
Lewisville, TX 75067-5910

Trio Pines U.S.A. Inc.
Attn: Corporate Officer
6655 Knott Ave.
Buena Park, CA 90620-1129

Tripaq
Attn: Corporate Officer
Po Box 101917
Pasadena, CA 91189-1917

Truck Trailer Mobile Service
Attn: Corporate Officer
Po Box 125
Orangevale, 95662-0125

Tube Tainer Inc.
Attn: Corporake Officer
8174 Byron Rd
Whittier, CA 90606-2616

Tytan International LLC
Attn: Corporate Officer
16240 W 110th St
Lenexa, KS 66219-1312

UPS #929569 Compton
Attn: Corporate Officer
Po Box 894820
Los Angeles, CA 90189-4820

Uline Inc.
Attn: Corporate Officer
Po Box 88741
Chicago, IL 60680-1741

Ultrapak Packaging
Attn: Corporate Officer
4345 Confederate Way
Macon, GA 31217-4719

Unifirst Corporation - Sacramento
Attn: Corporate Officer
4630 Beloit Dr. Suite 40
Sacramento, CA 95838-2449

Unifirst Corporation -Las Vegas
Attn: Corporate Officer
568 Parkson Rd ,
Henderson, NV 89011-4022

Uniform Ready D.B.A. Of Axis Express Hol
Attn: Corporate Officer
820 N. Main St. #1023
Salado, TX 76571-5727

United Brokerage Pk- Ga
Attn: Corporate Officer
C-O Accounts Receivable Po Box 1866
Augusta, GA 30903-1866

United States Trustee (LA)
915 Wilshire Blvd, Suite 1850
Los Angeles, CA 90017-3560

Universal Packaging Corporation
Attn: Corporate Officer
11440 E. 56th Ave. Suite 100
Denver, CO 80239-2230

VCT Visual Color Technologies
Attn: Corporate Officer
345 Paseo Tesoro
Walnut, CA 91789-2726

VIBAC Canada, Inc.
Attn: Corporate Officer
12250 Boul Industriel
Quibec Canada H1B 5M5

Vav Paper
Attn: Corporate Officer
PO Box 683
Addison, IL 60101-0683

Veritiv Operating Company
Attn: Corporate officer
PO Box 57006
Los Angeles, CA 90074-7006

Waste Management Hayward
Attn: Corporate Officer
PO Box 541065
Los Angeles, CA 90054-1065

Waste Management Inc
Attn: Corporate Officer
As Payment Agent
PO Box 7400
Pasedena, CA 91109-7400

Wells Fargo
300 Tri-State International
Suite 400
Lincolnshire, IL 60069-4417

Wells Fargo Bank, N.A.
300 Tri State Intl., Ste. 400
Lincolnshire, IL 60069-4417

Wells Fargo Bank, N.A.
800 Walnut Street, F0005-044
Des Moines, IA 50309-3891

Winn-Palletmaster
Attn: Corporate Officer
1270 N Blue Gum St
Anaheim, CA 92806-2413

Wolters Kluwer Lien Solutions
Lien Solutions
PO Box 29071
Glendale, CA 91209-9071

Xtra Lease LLC
Att: Corporate Officer
PO Box 219562
Kansas City, MO 64121-9562

Xtra Lease LLC
PO BOX 219562
Kansas City, MO 64121-9562

Yeats Appliance Dolly Mfg.
Attn: Corporate Officer
924 E Walnut Ave
Fullerton, CA 92831-4534

Zumasys
Attn: Corporate Officer
1050 Calle Amanecer Suite A
San Clemente, CA 92673-6296

The preferred mailing address (p) above has been substituted for the following entity/entities as so specified
by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).

Centerpoint Energy
Attn: Corporate Officer
PO Box 4981
Houston, TX 77210-4981

Nissan Motor Acceptance
8900 Freeport Pkwy
Irving, TX 75063-2409

Staples, Inc.
Staples / Shane Anderson
PO Box 102419
Columbia, SC 29224

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

(u)American Express Credit Card
Attn: Corporate Officer

(u)Comcast Business
Attn: Corporate officer
NEED ADDRESS

(u)ICON IPC Property Owner Pool 6
Attn: Corporate Officer

(u)ICON IPC Property Owner Pool 6
Attn: Corporate Officer
NEED ADDRESS

(u)Misc Vendors

(u)Nanjing Dp International Co., Ltd.
Attn: Corporate Officer
Room 1513 Times Center
1704 Shuanglong RD Jianging Distric
Jiangsu Province

(u)Penske Carrollton-Pioneer
Attn: Corporate Officer

(u)Qingdao Wing Cheong Tai Cargo Control Co
Attn: Corporate Officer
East Part of Lan Ma Rd, Jiao Lai Town
Indus. Park Jiao Zhou City Quingdao
Shandong Province

End of Label Matrix
Mailable recipients   248
Bypassed recipients     8
Total                 256

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
515 S. Figueroa St. 8th Floor Los Angeles, CA 90071

A true and correct copy of the foregoing document entitled: **OBJECTION TO DEBTOR'S EMERGENCY MOTION FOR INTERIM AUTHORITY CASH COLLATERAL** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On *(date)* Jan. 6, 2026    , I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov
- Hatty K Yip    hatty.yip@usdoj.gov, hatty.k.yip@usdoj.gov

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On       Jan. 6, 2026 , I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

C.D.S. Moving Equipment, Inc.
375 W Manville St
Compton, CA 90220

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on 01-07-26    , I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.   BY MESSENGER DELIVERY ON 1-07-26

The Honorable Julia W. Brand
Courtroom:  1375
U.S. Bankruptcy Court
255 East Temple Street
Los Angeles, CA 90012

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| Jan. 6, 2026 | Rosemary Pinal | *Rosemary Pinal* |
| *Date* | *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*October 2024*                    Page 4                    **F 2090-1.2.APP.NONRES.ATTY**